**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ  07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JENNIFER HENRY, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>FUTU HOLDINGS LIMITED, LEAF HUA LI, and ARTHUR YU CHEN,<br><br>    Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

1

Plaintiff Jennifer Henry ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, and announcements made by Defendants, public filings, wire and press releases published by and regarding Futu Holdings Limited ("Futu" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Futu securities between April 27, 2020 and May 16, 2023, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.    In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.    Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Futu securities during the Class Period and was economically damaged thereby.

7.     Futu purports to be "an advanced technology company transforming the investing experience by offering fully digitalized financial services. Through its proprietary digital platforms, *Futubull* and *moomoo*, the Company provides a full range of investment services, including trade execution and clearing, margin financing and securities lending, and wealth management. The Company has embedded social media tools to create a network centered around its users and provide connectivity to users, investors, companies, analysts, media and key opinion leaders. The Company also provides corporate services, including IPO distribution, investor relations and ESOP solution services."

8.     The Company is incorporated in the Cayman Islands and has its principal place of business in Hong Kong, Special Administrative Region, People's Republic of China ("China"). Futu's American Depositary Shares ("ADS" or "ADSs") trade on the NASDAQ exchange under the ticker symbol "FUTU".

9.     Defendant Leaf Hua Li ("Li") is Futu's founder, Chairman, and Chief Executive Officer ("CEO").

10.     Defendant Arthur Yu Chen ("Chen") has served as the Company's Chief Financial Officer ("CFO") since September 2017.

11.     Defendants Li and Chen are collectively referred to herein as the "Individual Defendants."

12.     Each of the Individual Defendants:

(a)    directly participated in the management of the Company;

(b)    was directly involved in the day-to-day operations of the Company at the highest levels;

(c)    was privy to confidential proprietary information concerning the Company and its business and operations;

(d)    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)    approved or ratified these statements in violation of the federal securities laws.

13.    The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

14.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

15.    The Company and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

16.    On April 27, 2020, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2019 (the "2019 Annual Report"). Attached to the 2019 Annual Report were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Li and Chen attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

17.    The 2019 Annual Report contained the following risk disclosures regarding the Company's operations in China:

> ***We do not hold any license or permit for providing securities brokerage business in China. Although we do not believe we engage in securities brokerage business in China, there remain uncertainties to the interpretation and implementation of relevant PRC laws and regulations.***
>
> Pursuant to the relevant PRC laws and regulations, no entity or individual shall engage in securities business without the approval of the securities regulatory authority of the State Council. See "Item 4. Information on the Company—B. Business Overview—Regulations—Overview of the Laws and Regulations Relating to Our Business and Operations in China—Regulations on Securities Business." We do not hold any license or permit in relation to providing securities brokerage business in China. A significant portion of our

technology, research and development, management, supporting and other teams are based in China and a large number of our clients are PRC citizens. However, we do not believe the business we are conducting now through our subsidiaries or consolidated affiliated entities in China is securities brokerage business in China. In the past, we received inquiries relating to our business from certain regulatory authorities in China. We have since then taken measures to modify and enhance our business and platform to be in compliance with the applicable PRC laws and regulations related to securities brokerage business in China. However, we cannot assure you that the measures we have taken or will take in the future will be effective or fully satisfy the relevant regulatory authorities' requirements. Based on the opinion of our PRC counsel, CM Law Firm, we are in compliance with the applicable PRC laws and regulations related to securities brokerage business in China after such modifications in all material aspects. ***However, there remain some uncertainties as to how the current and any future PRC laws and regulations will be interpreted or implemented in the context of operating securities related business in China***. We cannot assure you that our current operation model, such as redirecting users and clients to open accounts and make transactions outside China, will not be deemed as operating securities brokerage business in China, which may subject us to further inquiries or rectifications. ***If certain of our activities in China were deemed by relevant regulators as provision of securities brokerage services, investment consulting services and stock options brokerage business in China, we will be required to obtain relevant licenses or permits from relevant regulatory bodies, including the CSRC, and failure of obtaining such licenses or permits may subject us to regulatory actions and penalties, including fines, suspension of parts or all of our operations in the PRC, and temporary suspension or removal of our websites and mobile application in China***. In such cases, our business, financial condition, results of operations and prospects may be materially and adversely affected.

(Emphasis added).

***We have not obtained certain relevant licenses from PRC authorities in connection with some of the information and services available on our platform***.

PRC regulations impose sanctions for engaging in disseminating analysis, forecasting, advisory or other information related to securities and securities markets without having obtained the Securities Investment Consultancy

Qualifications in China. See "Item 4. Information on the Company—B. Business Overview—Regulation—Overview of the Laws and Regulations Relating to Our Business and Operations in China—Regulations on the Securities Investment Consulting Service." ***We have not obtained the Securities Investment Consultancy Qualifications in China***. Without the required qualifications, we should refrain from as well as explicitly prohibit our users from sharing information related to securities analysis, forecasting or advisory on our platform. However, we cannot assure you that our users will not post articles or share videos that contain analysis, forecasting or advisory content related to securities on our platform. If any of the information or content displayed on our platform is deemed as analysis, forecasting, advisory or other information related to securities or securities markets, or any of our business in the PRC is deemed to be a service providing such information, we may be subject to regulatory measures including warnings, public condemnation, suspension of relevant business and other measures in accordance with applicable laws and regulations. Any such penalties may disrupt our business operations or materially and adversely affect our business, financial condition and results of operations.

*        *        *

In August 2019, we officially launched our online wealth management service which gives our clients access to money market, fixed income and equity funds products from leading fund houses. According to the Securities Investment Funds Law, any entity that engages in the fund services, including but not limited to sales, investment consulting, information technology system services, shall register or file with the securities regulatory authority of the State Council. See "Item 4. Information on the Company—B. Business Overview—Regulations—Overview of the Laws and Regulations Relating to Our Business and Operations in China—Regulation on Fund Sales Business." We do not hold any license or permit in the promotion of, sales of, purchase of or redemption of funds in China. ***We do not believe the business we are conducting now through our subsidiaries or consolidated affiliated entities in China should be deemed as fund services in China. However, we cannot assure you that relevant regulatory will take the same view as ours***. If certain of our activities in China were deemed by relevant regulators as provision of fund services in China, we may be subject to penalties including imposition of fines and suspend of such fund sales business.

***PRC laws and regulations are evolving, and there are uncertainties relating***

**to the regulation of different aspects of the services we provide through our platforms in China. We cannot assure you that we will not be found in violation of any future laws and regulations or any of the laws and regulations currently in effect due to changes in or discrepancies with respect to the relevant authorities' interpretation of these laws and regulations**. In addition, we may be required to obtain additional license or approvals, and we cannot assure you that we will be able to timely obtain or maintain all the required licenses or approvals or make all the necessary filings in the future.

(Emphasis added).

18.    These risk disclosures were materially false and misleading because, while the Company disclosed that it was not properly licensed in China, it materially misrepresented the level of risk of operating unlicensed in China. Rather than plainly indicating that its activities in China were illegal, and that its Hong Kong license did not carry over to its activities in China, it falsely indicated that there were "uncertainties" or other legal ambiguities to the applicable Chinese laws.

19.    On March 26, 2021, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2020 (the "2020 Annual Report"). Attached to the 2020 Annual Report were signed certifications pursuant SOX signed by Defendants Li and Chen attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

20.    The 2020 Annual Report contained, in pertinent part, the following disclosure about its unlicensed activities in China:

9

***We do not hold any license or permit for providing securities brokerage business in China. Although we do not believe we engage in securities brokerage business in China, there remain uncertainties to the interpretation and implementation of relevant PRC laws and regulations.***

Pursuant to the relevant PRC laws and regulations, no entity or individual shall engage in securities business without the approval of the securities regulatory authority of the State Council. See "Item 4. Information on the Company—B. Business Overview—Regulations—Overview of the Laws and Regulations Relating to Our Business and Operations in China—Regulations on Securities Business." ***We do not hold any license or permit in relation to providing securities brokerage business in China.*** A significant portion of our technology, research and development, management, supporting and other teams are based in China and a large number of our clients are PRC citizens. ***However, we do not believe the business we are conducting now through our subsidiaries or consolidated affiliated entities in China is securities brokerage business in China***. In the past, we received inquiries relating to our business from certain regulatory authorities in China. We have since then taken measures to modify and enhance our business and platform to be in compliance with the applicable PRC laws and regulations related to securities brokerage business in China. ***However, we cannot assure you that the measures we have taken or will take in the future will be effective or fully satisfy the relevant regulatory authorities' requirements***. Based on the opinion of our PRC counsel, Han Kun Law Offices, we are not in violation of the applicable PRC laws and regulations related to securities brokerage business in China after such modifications in all material aspects. ***However, there remain some uncertainties as to how the current and any future PRC laws and regulations will be interpreted or implemented in the context of operating securities related business in China***. We cannot assure you that our current operation model, such as redirecting users and clients to open accounts and make transactions outside China, will not be deemed as operating securities brokerage business in China, which may subject us to further inquiries or rectifications. If certain of our activities in China were deemed by relevant regulators as provision of securities brokerage services, investment consulting services and stock options brokerage business in China, we will be required to obtain relevant licenses or permits from relevant regulatory bodies, including the CSRC, and failure of obtaining such licenses or permits may subject us to regulatory actions and penalties, including fines, suspension of parts or all of our operations in the PRC, and temporary suspension or removal of our websites and mobile application in China. In

10

such cases, our business, financial condition, results of operations and prospects may be materially and adversely affected.

(Emphasis added).

21. The risk disclosures were materially false and misleading because, while the Company disclosed that it was not properly licensed in China, it materially misrepresented the level of risk of operating unlicensed in China. Rather than plainly indicating that its activities in China were illegal, and that its Hong Kong license did not carry over to its activities in China, it falsely indicated that there were "uncertainties" or other legal ambiguities to the applicable Chinese laws.

22. Then, on December 17, 2021, in response to a *Reuters* article (discussed in paragraph 25) which correctly predicted that the Company would eventually face a regulatory crackdown, the Company released a statement on its website entitled "Futu Responds to Media Report", which stated the following:

> [Futu], a leading tech-driven online brokerage and wealth management platform, today responds to the media speculations regarding potential PRC regulatory policies that may have a material adverse impact on the Company's business operation. As a Nasdaq-listed company, Futu is committed to timely disclosing recent developments that may have a material adverse impact on the Company's business operation, including regulatory developments.
>
> ***Futu always maintains active communication with different competent PRC regulatory authorities in its ordinary course of business***. To date, the Company has not received (nor is it aware of) any notice, guidance or order from any PRC regulatory authorities which is expected to have a material adverse impact on its business operation or financial conditions. The Company has been operating steadily and will continue to serve existing and new clients.

In terms of serving the PRC clients, Futu has been abiding by the same rules and regulations and adopting the similar industry practices and business models as other brokers who hold the same type of licenses in Hong Kong. No further innovations or breakthroughs have been made by Futu with respect to the business model. There is no such "internet broker-dealer" category or definition under relevant legal framework and nowadays almost all broker-dealers are using internet (through App and/or website) to serve their clients. Futu will keep monitoring regulatory developments and continue to fully cooperate with relevant regulatory authorities.

During the recent period, *the Company noticed that some individuals and institutions have been spreading false or fake information about Futu on social media with the purpose of profiting from short-selling*. We have gathered relevant information and further reported to relevant regulators. We also reserve our right to take legal action.

*We believe that the regulatory authorities in mainland China and Hong Kong have always attached great importance to protecting investors, maintaining a healthy and stable financial market, and prudently formulating policies and guiding the industry*. We caution the media and the public to distinguish false and fake information and avoid being taken advantage of.

(Emphasis added).

23.    This statement was false and misleading because the Company's business did not comply with Chinese securities laws, and the statement understated the significant regulatory risk facing the Company, and falsely cast any concerns about the Company as aspersions designed to benefit shortsellers, rather than being rooted in fact.

24.    Then, on March 18, 2022, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2021 (the "2021 Annual Report"). Attached to the 2021 Annual Report were signed certifications pursuant to

SOX signed by Defendants Li and Chen attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

25.     Notwithstanding the speech made by Sun Tianqi, the head of the financial stability department of the People's Bank of China (China's central bank), in which he stated that operating in China without a license was "illegal financial activity", as discussed below, the Company made essentially the same risk disclosure as it had in its 2019 and 2020 Annual Reports when it came to its blatantly illegal business activities in China. The 2021 Annual Report contained, in pertinent part, the following disclosure about its activities in China:

> ***We do not hold any license or permit for providing securities brokerage business in Mainland China. Although we do not believe we engage in securities brokerage business in Mainland China, there remain uncertainties to the interpretation and implementation of relevant PRC laws and regulations. If some of our activities in Mainland China were deemed by relevant regulators as provision of securities business such as securities brokerage services, investment consulting services, and/or futures business in Mainland China, our business, financial condition, results of operations and prospects may be materially and adversely affected.***
>
> Pursuant to the relevant PRC laws and regulations, no entity or individual shall engage in securities business without the approval of the securities regulatory authority of the State Council. See "Item 4. Information on the Company—B. Business Overview—Regulation—Overview of the Laws and Regulations Relating to Our Business and Operations in China—Regulations on Securities Business." ***We do not hold any license or permit in relation to providing securities brokerage business in Mainland China***. A significant portion of our technology, research and development, management, supporting and other teams are based in Mainland China and a large number of our users are PRC residents. ***While we do not believe the business we are***

*conducting now through our subsidiaries or consolidated affiliated entities in China is securities brokerage business in China, we cannot assure you that certain of our activities such as redirecting users in China to brokers or other licensed entities outside of China will not be deemed as operating securities brokerage business in China*. In the past, we received inquiries relating to certain aspects of our activities from certain regulatory authorities in China. *We have taken measures in a timely manner to modify and enhance our business and platforms to be in compliance with the current applicable PRC laws and regulations related to securities brokerage business in China*. However, we cannot assure you that the measures we have taken or will take in the future will be effective or fully satisfy the relevant regulatory authorities' requirements. *Based on the opinion of our PRC legal counsel, Han Kun Law Offices, we are not in violation of the current applicable PRC laws and regulations related to securities brokerage business in China in any material aspects. However, there remain some uncertainties as to how the current and any future PRC laws and regulations will be interpreted or enforced in the context of operating securities related business in Mainland China*. If some of our activities in Mainland China were deemed by relevant regulators as provision of securities business such as securities brokerage services, investment consulting services and/or futures business in China, we will be required to obtain relevant licenses or permits from relevant regulatory bodies, including the CSRC, and failure of obtaining such licenses or permits may subject us to regulatory actions and penalties, including fines, suspension of parts or all of our operations in the PRC, and temporary suspension or removal of our websites, desktop devices and mobile application in China. In such cases, our business, financial condition, results of operations and prospects may be materially and adversely affected. In addition, while we have internal policies in place regulating relevant activities of our employees and their dealings with our business partners, if our employees or business partners engage in certain activities that relevant authorities would require permits or licenses for, we may be subject to regulatory enquiries or penalties and negative publicity.

(Emphasis added).

26.    This disclosure was materially false and misleading because, while the Company disclosed that it was not properly licensed in China, it materially misrepresented the level of risk of operating unlicensed in China. Rather than plainly

indicating that its activities in China were illegal, and that its Hong Kong license did not carry over to its activities in China, it falsely indicated that there were "uncertainties" or other legal ambiguities to the applicable Chinese laws.

27.    Then, on April 24, 2023, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2022 (the "2022 Annual Report"). Attached to the 2022 Annual Report were signed certifications pursuant to SOX signed by Defendants Li and Chen attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

28.    The 2022 Annual Report contained the following risk disclosures:

*The approval of and/or the filing with the [China Securities Regulatory Commission, or "CSRC"] or other PRC governmental authorities may be required under PRC law in connection with our future offshore offering or listing of securities on a different market and if required, we cannot predict whether or how soon we will be able to obtain such approval or complete such filing.*

On February 17, 2023, the CSRC issued rules and regulations concerning the filing management of overseas listing, which came into effect on March 31, 2023. The rules and regulations issued include the Provisional Measures for the Administration of Overseas Issuance and Listing of Securities by Domestic Enterprises, or the New Filing Rules, and five supporting guidelines. The New Filing Rules dictate that enterprises that have been listed overseas prior to March 31, 2023 constitute "Existing Issuers." Existing Issuers are required to complete filing procedure with the CSRC if and when they pursue any refinancing activities, securities offerings and listings outside Mainland China, including but not limited to follow-on offering, primary listing, secondary listing, and listing by introduction, unless such securities are issued as equity incentive awards or in connection with conversion of public reserve funds into increased company capital, share dividends or share

split.

* * *

As announced by the CSRC on December 30, 2022, the CSRC has initiated inquiries on us regarding our cross-border operations in Mainland China, including the provision of cross-border securities services for domestic investors. ***As of the date of this annual report, we have limited information to accurately predict if any disciplinary action or punishment will be taken against us and/or our responsible officers after the conclusion of such inquiries, and if so, the nature and extent of any such action***. ***Although we have been and continue to take rectification measures on our business to be in compliance with laws and regulations and to meet the requirements from the CSRC during the inquiries***, we cannot assure or predict whether the CSRC is satisfied with our rectification measures and whether the CSRC would impose further regulatory actions and penalties on us, including fines, suspension of parts or all of our operations or activities in Mainland China, or suspension or removal of our websites, desktop devices and mobile applications in China, which, individually or taken as a whole, may affect our client base in China and revenue attribute to such clients, and therefore may have a material and adverse impact on our operations and financial results. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business and Industry—We do not hold any license or permit for providing securities brokerage services in Mainland China. As announced by the CSRC on December 30, 2022, the CSRC has initiated inquiries on us regarding our cross-border operations in Mainland China, including the provision of cross-border securities services for domestic investors. We have taken and may continue to take rectification measures based on our communication with or the requirements from the CSRC. ***If the CSRC is not satisfied with our rectification measures or the CSRC imposes other further regulatory actions or penalties on us, our business and results of operations may be materially and adversely affected***."

(Emphasis added).

29.    These disclosures were materially false and misleading because they did not disclose that the Chinese government had initiated inquiries into the

Company because by operating without a license, it was operating in blatant violation of Chinese law.

30.    The statements contained in ¶¶ 16, 17, 19, 20, 22, 24, 25, 27, and 28 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Futu's business was, quite simply, illegal as it related to operations in China as a result of its failure to obtain the proper licenses; (2) it did not fully disclose to investors that it was engaging in unlawful activity and instead falsely characterized the applicable Chinese laws as ambiguous; (3) the foregoing subjected the Company to a heightened risk of regulatory enforcement; and (4) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

31.    On Thursday, October 28, 2021, *The Wall Street Journal* released an article entitled "Chinese Online Broker Shares Dropped After Criticism From Central Bank", which discussed a speech given by Sun Tianqi, the head of the financial stability department of the People's Bank of China. The article stated, in pertinent part:

*A senior official at China's central bank said cross-border online brokerages operating in mainland China were acting illegally, knocking shares in U.S.-listed Futu Holdings Ltd.* [. . .]

*The criticism heaps new pressure on [Futu] after [it was] called out earlier this month by Chinese state media, which said the [firm] would face challenges due to the country's tough new data-privacy laws*. Chinese regulators have cracked down on various business sectors this year, including property development, after-school tutoring and parts of the technology industry.

Futu, which is backed by Tencent Holdings Ltd., [. . .] [has] thrived partly by enabling customers in mainland China to buy and sell U.S. and Hong Kong-listed stocks.

*Sun Tianqi, the head of the financial stability department of the People's Bank of China, told a forum in Shanghai that offering securities-brokerage services to mainland Chinese investors without obtaining the required licenses was "illegal financial activity."*

*"Financial licenses have national boundaries,"* Mr. Sun said.

His speech was delivered on Sunday and was picked up by numerous media outlets on Thursday [October 28, 2021], after a transcript was released by organizers a day earlier.

The central banker didn't name the two companies but identified them by referring to recent drops in their share prices.

Shares in Futu and Up Fintech fell sharply on Thursday. Futu closed 13% lower at $58.47, while Up Fintech tumbled 17% to $7.34. Stocks in both companies have swung wildly this year.

*China operates capital controls but Chinese nationals are able to open bank accounts in Hong Kong, and can move up to $50,000 a year offshore. Futu makes use of this setup by directing prospective clients in mainland China to open trading accounts in Hong Kong*.

18

Futu has told investors it doesn't believe it operates a securities-brokerage business onshore, and doesn't hold any permit to do so, but has warned of uncertainty in how Chinese law is implemented and interpreted.

In a statement Thursday, the company said more than 80% of new clients came from outside mainland China and that it had obtained licenses in many countries and regions.

Futu holds a series of licenses from its main regulator, the Hong Kong Securities and Futures Commission, company founder Li Hua said in a separate post on the company's Futubull app.

(Emphasis added).

32.     On this news, the price of Futu ADSs declined by $8.55 per ADS, or 12.75%, on extremely high trading volume, to close at $58.47 on October 28, 2021. It had declined by as much as 25.2% in intra-day trading.

33.     On December 17, 2021, after market hours, Reuters released an article entitled "EXCLUSIVE Next in China Regulatory crackdown: online brokers-sources". The article stated, in pertinent part:

Chinese officials are planning to ban online brokerages such as Futu Holdings Ltd (FUTU.O) [. . .] from offering offshore trading services to mainland clients, the latest development in a broad regulatory crackdown that has roiled a wide range of sectors over the past year.

The Nasdaq-listed Chinese firms are two of the biggest players in the sector and a ban would block millions of retail investors in mainland China from trading securities easily in markets such as the United States and Hong Kong. Concerns over data security and capital outflows are driving the potential ban, sources said.

The looming restrictions come on the heels of a clampdown that has affected a broad scope of companies over the past year, in sectors ranging from technology to education and real estate.

Firms affected by the latest crackdown are likely to be notified of a ban in "the coming months", said one of four sources who spoke with Reuters. All sources declined to be identified as they were not authorised to speak to media.

***Futu [is] registered with the Securities and Futures Commission in Hong Kong but that permit does not extend to the mainland. No mainland licence exists for online brokerages specialising in cross-border trades, the sources said***.

Futu, a $5.5 billion company by market value, ***said in a statement to Reuters it had been communicating with Chinese authorities but had not received any formal orders along the lines of those suggested by Reuters reporting***. It added that it was operating normally.

It flagged in a prospectus for a follow-on share offering in April that its business could be affected by a change in stance on the part of authorities who have wide discretion in interpreting regulations.

\* \* \*

The China Securities Regulatory Commission (CSRC), the State Administration of Foreign Exchange (SAFE) and the central bank did not immediately respond to a request for comment.

Chinese authorities raised concern about "cross-border" brokerages in October, exacerbating declines in shares in both firms which have plunged more than 80% since this year's peak in February.

34.     On this news, the price of Futu ADSs declined by $0.45 per ADS, or 1.15% compared to the prior day's closing price, to close at $38.63.

35.     On December 30, 2022, *The Wall Street Journal* released an article entitled "China Regulator Says Futu, Up Fintech Violated Laws". The article stated, in pertinent part:

*China's securities regulator said two Nasdaq-listed online brokers violated its domestic laws by allowing customers on the mainland to make cross-border trades, stoking concerns that Chinese authorities aren't finished with their crackdowns on private-sector companies.*

The [ADSs] of [. . .] Futu Holdings Ltd. fell 31% after the China Securities Regulatory Commission put out a statement that mentioned both companies.

Futu said in a statement that it will cooperate fully with the CSRC and take all necessary measures to comply with China's laws and regulations. [. . .]

Futu, which has been listed in the U.S. since 2019, had recently been planning to add a listing in Hong Kong. On Thursday, it abruptly postponed that plan— a day before its intended trading debut—and said it was clarifying certain matters with the city's exchange.

[. . .] Futu operate[s] [a] popular retail-trading [app] that [is] similar to that of Robinhood Markets Inc., and [is] used by individuals in Asia to trade stocks and options listed on major exchanges in the U.S., Hong Kong and other markets. Futu counts Chinese internet giant Tencent Holdings Ltd. as a strategic investor.

Even though China has strict capital controls, Chinese nationals can open bank accounts in Hong Kong and move up to $50,000 each year offshore. They have also been able to set up brokerage accounts in the city to buy and sell overseas stocks. [. . .]

The CSRC said the online brokers' act of offering offshore securities-trading services to clients in mainland China doesn't comply with the country's laws and regulations. It said its officials had discussions with Futu and Up Fintech's senior executives in late 2021 and told them to comply with such laws.

*The regulator also said it was requiring Futu [. .] to stop taking on or soliciting new domestic clients and customers, who aren't allowed to open accounts.*

The CSRC said it intends to dispatch officers to conduct on-site inspections on [Futu]. *They would "supervise and urge the rectification, and take*

***further regulatory measures depending on the rectification," the statement added***.

***In October 2021, Chinese state media had called out [Futu] for flouting China's securities and other laws***. A senior official at China's central bank subsequently said cross-border online brokerages in mainland China were operating illegally, adding to a selloff in their [ADSs].

Chinese regulators have over the past two years clamped down on many fast-growing businesses. The actions have caused a massive selloff in the stocks of Chinese internet-platform companies, private-tutoring firms and other businesses. In recent months, Beijing has signaled that it was easing its regulatory crackdowns and pivoting to provide more support to private-sector enterprises.

(Emphasis added).

36.     On this news, the price of Futu ADSs declined by $18.26 per ADS, or

31%, to close at $40.65 on December 30, 2022.

37.     On May 16, 2023, during market hours, *Reuters* released an article

entitled "Two online brokerages to remove China apps as Beijing data crackdown

widens". The article stated, in pertinent part:

Online brokerages Futu Holdings Ltd and UP Fintech Holding Ltd will remove apps in mainland China amid Beijing's sharpened focus on data security and capital outflows, triggering a heavy selloff in their New York-listed shares.

***Chinese regulators had warned the two firms as early as 2021 that online brokerages not licensed in China were acting illegally if they served Chinese clients via the internet***.

Futu's Nasdaq-listed shares slumped 7.5% in early market trading on Tuesday, while UP Fintech dropped nearly 9% after the announcements, recouping some premarket losses; both stocks have been under pressure in the last couple of years over regulatory concerns.

*The removal of the apps is the latest in a series of actions Beijing has taken in the last couple of years to crack down on a wide range of sectors, and data or information security has emerged as a key concern for authorities*.

In the last two months, China clamped down on consultancy and due diligence firms that thrived by providing investors access to industry experts and investigators who could obtain valuable corporate information.

Futu, backed by Chinese internet giant Tencent Holdings Ltd (0700.HK), said on Tuesday its apps would be removed from app stores in China from May 19, while UP Fintech, also known as Tiger Brokers, would do the same with effect from May 18.

Both firms said their existing clients in mainland China would not be affected by the removal of apps.

The removal of Futu and UP Fintech apps would bar a large number of potential retail investors in mainland China from trading securities easily in markets such as the U.S. and Hong Kong.

Reuters first reported in Dec. 2021 that Chinese officials were planning to ban online brokerages such as Futu and UP Fintech from offering offshore trading services to mainland clients.

Last December, the China Securities Regulatory Commission (CSRC) said Futu and UP Fintech had conducted unlawful securities business and banned them from soliciting new business from mainland investors.

38.    On this news, the price of Futu ADSs declined $1.91 per ADS, or 4.4%, to close at $41.24 on May 16, 2023.

39.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

23

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

40.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Futu securities publicly traded on the NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

41.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Futu securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

42.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

43.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and

securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

44.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Futu securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

45.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

46.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Futu securities met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;

- As a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as

communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

47.    Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

48.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants

49.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

50.    This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

51.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

52.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

53.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

54.    Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true

facts in the statements made by them or other Futu personnel to members of the investing public, including Plaintiff and the Class.

55.    As a result of the foregoing, the market price of Futu securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Futu securities during the Class Period in purchasing Futu securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

56.    Had Plaintiff and the other members of the Class been aware that the market price of Futu securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Company securities at the artificially inflated prices that they did, or at all.

57.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

58.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Futu securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

59.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

60.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

61.    As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

62.     Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful

31

acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

63.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of herself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)    awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: June  12, 2023                    **THE ROSEN LAW FIRM, P.A**
                                         <u>/s/ Laurence M. Rosen</u>
                                         Laurence M. Rosen, Esq.
                                         One Gateway Center, Suite 2600
                                         Newark, NJ 07102
                                         Tel: (973) 313-1887
                                         Fax: (973) 833-0399
                                         Email: lrosen@rosenlegal.com

                                         *Counsel for Plaintiff*

33