SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
CHRISTOPHER L. AYERS
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  973/639-9100
973/679-8656 (fax)
cseeger@seegerweiss.com
cayers@seegerweiss.com

Liaison Counsel

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JENNIFER HENRY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>FUTU HOLDINGS LIMITED, et al.,<br><br>Defendants. | No. 2:23-cv-03222-BRM-CLW<br><br><u>CLASS ACTION</u><br><br>AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><u>DEMAND FOR JURY TRIAL</u> |

1.     This is a federal securities class action on behalf of all persons and entities that purchased or otherwise acquired Futu Holdings Limited ("Futu" or the "Company") American Depositary Shares ("ADS") between April 27, 2020 and May 16, 2023, inclusive (the "Class Period"), and were damaged thereby (the "Class"), against Futu, its Chief Executive Officer ("CEO") and Chairman Leaf Hua Li ("Li"), and its Chief Financial Officer ("CFO") Arthur Yu Chen ("Chen") (collectively "Defendants") for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.[1]

## I.     INTRODUCTION

2.     Futu is an online securities brokerage that, according to its website, offers a "fully digitalized brokerage platform" called either *Futubull* or *Moomoo*, depending

---

[1]     Lead Plaintiffs Treasurer of the State of North Carolina, on behalf of the North Carolina Retirement Systems, the North Carolina Department of State Treasurer and the North Carolina Supplemental Retirement Board of Trustees, on behalf of the North Carolina Supplemental Retirement Plans (collectively the "North Carolina Funds"), and the Indiana Public Retirement System ("Indiana PRS" and together with the North Carolina Funds, "Plaintiffs"), on behalf of themselves and the Class, by and through their undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs' own acts, and upon information and belief as to all other matters.  Plaintiffs' information and belief are based on, among other things, the independent investigation of counsel.  This investigation includes, but is not limited to, a review and analysis of: (i) Futu's public filings with the United States Securities and Exchange Commission ("SEC"); (ii) transcripts of Futu senior managements' conferences with investors and analysts; (iii) press releases disseminated by the Company; (iv) media reports concerning Futu; (v) analyst reports concerning Futu; and (vi) other public information and data concerning Futu.

on the market.  These digital platforms enable Futu's clients to "trade securities, such as stocks, warrants, options and exchange-traded funds, or ETFs across different markets" using only their mobile devices.  Though Futu's principal place of business is Hong Kong, Special Administrative Region of the People's Republic of China ("Hong Kong"), from the Company's inception, Futu has targeted the younger, "emerging affluent population" in the Peoples Republic of China ("PRC," "China," or "Mainland China"), which seeks to access the financial markets in the United States and Hong Kong.  During the Class Period, China was one of Futu's largest markets, and Defendants repeatedly touted Futu's "stellar growth" in China to investors during the Company's earnings calls.

3.    Throughout the Class Period, Defendants falsely assured investors that Futu's securities brokerage business in China complied with the applicable Chinese securities regulations.  In reality, for decades, the Securities Law of the People's Republic of China (the "PRC Securities Law") had required that brokerage firms apply for and obtain licenses from the PRC State Council in order to operate in China, yet Futu was illegally operating in China without one.

4.    The fact that Futu only provided *online* brokerage services in China did not excuse the Company from obtaining a Chinese brokerage license, as Defendants misleadingly contended throughout the Class Period.  Chinese regulators made clear prior to the start of the Class Period that China's licensure requirements applied

- 2 -

equally to overseas and online brokerages like Futu that were accessing the Chinese market. Two months before the start of the Class Period, on March 1, 2020, the National People's Congress (the "NPC") – which is the singular branch of government in China – enacted an amendment to the PRC Securities Law and clarified that the reach of the law extended to "securities issuance and trading activities outside the territory of the People's Republic of China" that "disrupt the order of the market within the territory of the People's Republic of China." This revision removed any doubt that the licensure requirement applied to online foreign brokerages operating in China, like Futu, and was widely reported in the media. For example, a December 24, 2019 article in the *Global Times* highlighted the amended PRC Securities Law's focus on tightening the "regulation of illegal trading" and creating "tougher penalties for illegal securities activities."

5.      In October 2021, it became apparent that Chinese regulators were zeroing in on securities brokerage businesses operating illegally in China without a license. On October 14, 2021, the official newspaper of the Central Committee of the Chinese Communist Party, *People's Daily*,[2] reported that it had learned from the China Securities Regulatory Commission ("CSRC") – which is the Chinese equivalent to the SEC in the United States – that "no domestic or foreign institutions have been

---

[2]      *People's Daily* is widely considered the official voice of the central government of China. With a circulation of over 3 million, *People's Daily* is the most influential and authoritative newspaper in China.

approved to provide services for domestic investors to participate in overseas securities transactions." The CSRC's proclamation clearly conveyed its position that any foreign brokerage business currently operating in China, including Futu, was doing so illegally, as no foreign institutions had obtained the approval and licensing required by Chinese law. Just days later, the illegality of Futu's operations in China again made the news. On October 28, 2021, numerous media outlets reported on a speech given by Tianqi Sun ("Sun"), the head of the financial stability department at the People's Bank of China ("PBOC"), in which he said that "cross-border online brokerages" were conducting "illegal financial activities." Despite these clear warnings that Futu was operating in China illegally, Defendants took no steps to obtain the brokerage license required by Chinese law, and continued to falsely represent to investors that Futu was in compliance with the applicable laws.

6.    On December 30, 2022, more than a year after the CSRC had initially indicated that Futu was operating illegally in China, the CSRC specifically identified Futu as an illegal operator, expressly stated that the Company's business in China "doesn't comply with the country's laws and regulations," and banned Futu from acquiring any new clients in China. Even then, Defendants did not come clean with investors. Instead, they falsely assured them that Futu had "full cooperation with the regulators," that the "overall impact is quite manageable," and that Futu's growth in China was still "very strong."

7.    Despite these warnings from multiple Chinese authorities, Defendants falsely and misleadingly insisted to investors that though the PRC Securities Law applicable to securities brokerage businesses contained "some uncertainties," Futu was in compliance with the applicable regulations.    To bolster their misrepresentations, Defendants represented in Futu's public filings that various law firms they had retained had determined that Futu was "in compliance with the applicable PRC laws and regulations related to securities brokerage business in China."

8.    When analysts expressed "some concerns about legality of offshore trading by online brokers," and asked whether "management can shed some light on the impact of the government regulation," Defendants falsely and misleadingly represented that Futu "monitor[ed]" and "embrac[ed]" the relevant regulations in the PRC Securities Law, was "actively and transparently" communicating with Chinese regulators about those regulations, and would "timely disclos[e]" to investors any developments regarding the regulations that "may have a material adverse impact on the Company's business operations."  And even after the Chinese government banned Futu from opening any new accounts in China, Defendants continued to mislead investors by reassuring them that any obstacles Futu faced in China were "manageable," and by steadfastly maintaining that the Company could continue to grow its business in China.

9.      The truth about the illegality of Futu's operations in China began to emerge over time, as Chinese regulators ramped up their scrutiny on the Company during the Class Period.  Through four increasingly targeted revelations, investors eventually came to learn that Futu was, in fact, violating Chinese law, and would ultimately suffer the severest of consequences – the complete removal of Futu's app in one of the Company's largest markets, China, and a complete ban from acquiring any new users in that market.  With each revelation, the price of Futu's ADS fell dramatically, inflicting substantial harm on Plaintiffs and other investors in Futu ADS.

## II.    JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

12.     Venue is proper in this judicial district pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because the alleged misstatements entered, and the subsequent damages took place, in this District.  Moreover, Defendants are all foreign residents and took the actions and made the statements giving rise to the claims at issue overseas, making venue proper in any district court of the United States.

13.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities exchange.

## III.    PARTIES

### A.    Plaintiffs

14.    Lead Plaintiffs Treasurer of the State of North Carolina, on behalf of the North Carolina Retirement Systems, and the North Carolina Department of State Treasurer and the North Carolina Supplemental Retirement Board of Trustees, on behalf of the North Carolina Supplemental Retirement Plans, manage over $120 billion in assets for the benefit of nearly one million participants and their beneficiaries, in North Carolina.  The North Carolina Funds, as set forth in the certifications filed herewith as Exhibit A, acquired Futu ADS on the NASDAQ Global Market at artificially inflated prices during the Class Period and were damaged thereby.

15.    Lead Plaintiff Indiana Public Retirement System manages over $40 billion in assets maintained for the benefit of employees of the State of Indiana. Currently, Indiana PRS manages assets on behalf of approximately 500,000 participants.  As set forth in the certification filed herewith as Exhibit B, Indiana PRS

acquired Futu ADS on the NASDAQ Global Market at artificially inflated prices during the Class Period and were damaged thereby.

### B.    Defendants

#### 1.    Futu Holdings Limited

16.    Defendant Futu is a technology company that offers a fully digitalized securities brokerage platform to investors.  The Company is incorporated in the Cayman Islands and its principal place of business is in Hong Kong.  Futu's ADS trade on the NASDAQ Global Market, which is an efficient market, under the ticker symbol "FUTU."  Futu also operates a subsidiary in the United States called Futu US Inc.  Futu US Inc. operates several additional U.S. subsidiaries, including Moomoo Financial Inc., Futu Clearing Inc., Moomoo Technologies Inc., Futu Futures Inc., and Futu Wealth Advisors Inc.

#### 2.    Individual Defendants

17.    Defendant Leaf Hua Li founded Futu in 2007, and served as the Company's CEO and Chairman of its Board of Directors (the "Board") throughout the Class Period.  Defendant Li signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") accompanying each of the Annual Reports on SEC Form 20-F filed during the Class Period, and made numerous false and misleading statements during the Class Period.

18.    Defendant Arthur Yu Chen became Futu's CFO in 2017, and served in that role throughout the Class Period.  As Futu's CFO, defendant Chen signed

- 8 -

certifications pursuant to SOX accompanying each of the Annual Reports on SEC Form 20-F filed during the Class Period, and made numerous false and misleading statements during the Class Period.

19.    Li and Chen (collectively, the "Individual Defendants"), because of their positions within the Company, possessed the power and authority to control the contents of Futu's annual and quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's financial reports and press releases alleged herein to be false or misleading before or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Throughout the Class Period, the Individual Defendants, as the most senior executive officers of Futu, and as further detailed herein, were privy to confidential and proprietary information concerning Futu.  The Individual Defendants had access to non-public information about the Company's business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, via attendance at management and/or Board meetings, via reports and other information provided to them in connection therewith, and via communications with Chinese regulators.

20.    Li and Chen also knew of and/or participated in the fraudulent scheme alleged herein, knew and/or recklessly disregarded that the adverse facts specified

4866-0813-6347.v2

herein had not been disclosed to and were being concealed from the public, and knew and/or recklessly disregarded that the affirmative representations being made were then materially false and misleading.

## IV.    BACKGROUND AND SUMMARY OF THE ACTION

### A.    Futu Operated a Securities Brokerage Business in China, Which Was One of the Company's Largest Markets

21.    Though Defendants falsely and misleadingly told investors otherwise, there is no doubt Futu operated a securities brokerage business in China throughout the Class Period.  On the Company's website, Futu describes itself as "an advanced technology company transforming the investing experience by offering a fully digitized *brokerage* platform."  The Company further represents that through its proprietary digital platforms, *Futubull* and *Moomoo*, Futu provides a full range of brokerage services, including "trade execution and margin financing which allow [its] clients to trade securities, such as stocks, warrants, options and exchange-traded funds, or ETFs, across different markets."  According to Futu, these brokerage services are "[t]he Company's primary fee-generating services."

22.    During the Class Period, the two main markets for Futu's brokerage services were China and Hong Kong, and Defendants repeatedly touted the "stellar growth" in these two markets on investor earnings calls.  As Futu's Senior Vice President, Robin Li Xu ("Xu"), explained on the Company's August 13, 2020 earnings call (via translation by Futu's Chief of Staff and Head of Investor Relations,

Daniel Yuan ("Yuan")): as of fiscal year-end 2019 "about 70% of our paying clients were from Mainland [China] and 30% from Hong Kong." Defendant Chen, who also participated in the call, further emphasized that Futu intended to target China for new business as well, stating: "I think, roughly speaking, we still target 50% from the [sic] Hong Kong. The remaining 50% from the Mainlands." Futu's focus on China continued into the Class Period, with the Individual Defendants telling investors in March and May 2021, that approximately 75%-80% of the Company's new paying clients were "almost evenly split within Mainland China and also Hong Kong." The Defendants' own representations clearly show that, throughout the Class Period, Futu operated a securities brokerage business in China, which was one of the Company's largest markets.

### B. The PRC Securities Law Has Long Forbidden Securities Brokerages Businesses from Operating in China Without a License

23.    The Chinese government has prohibited securities brokerage businesses from operating in China without a license for decades. On December 29, 1998, the Sixth Session of the Ninth NPC in China issued the first version of the PRC Securities Law, which established comprehensive regulatory rules for the issuance and trading of securities. The law went into effect on July 1, 1999, and prescribed, among other things, that in order for a securities company to do business in China, it must first

obtain approval and an appropriate license from the State Council. More specifically, the relevant regulations provided:

> Article 117. The establishment of a securities company must be examined and approved by the State Council's securities regulatory body. ***Without the approval of this institution, no one is allowed to engage in securities business.***

> \*     \*     \*

> Article 119. The state exercises management over securities companies, dividing them into comprehensive securities companies and brokerage securities companies. ***The State Council's securities regulatory body will provide them with licenses according to their different types.***

> \*     \*     \*

> Article 129. Comprehensive securities companies shall operate the following types of securities business:

> (1) ***Securities brokerage business***;

> (2) Securities proprietary business;

> (3) Securities underwriting business;

> (4) Other securities businesses approved by the State Council securities regulatory body.

> \*     \*     \*

> Article 131. ***Securities companies shall submit application for the scope of business allowed to the State Council securities regulatory body for approval*** in accordance with the provisions specified in the preceding two articles. ***Securities companies shall not operate securities or other types of business beyond the approved scope of business.***

> \*     \*     \*

- 12 -

Article 137.  A securities company that buys and sells securities on behalf of customers and operates as an intermediary shall be a securities brokerage with the credentials of a legal person.

24.     Even this earliest version of these regulations in the PRC Securities Law made clear that securities businesses cannot operate in China without first obtaining a license from China's State Council.

25.     Each subsequent revision to those regulations in the PRC Securities Law continued to emphasize the licensing requirement.  For example, when China revised its securities laws on October 27, 2005, which went into effect on January 1, 2006, the NPC reiterated the requirement that securities businesses must first obtain approval from the State Council before they could begin operating in China.  In Article 122 of the revised law, the NPC specified that: "The establishment of a securities company shall be subject to examination and approval by the securities regulatory authority under the State Council.  ***No one may engage in securities business without approval of the said authority***."  Article 125 of the revised law further specified that approval of the State Council was required before a company engaged in whole or in part of the securities brokerage business and/or financial advice related to the activities of securities trading or securities investment.  The NPC emphasized this requirement in Article 128, where it explicitly stated: "***If a permit for securities business is not obtained, no securities company may engage in securities business***."

26.    These revisions underscored China's requirement that entities that "engage in the whole or [in] part" in the securities brokerage business, like Futu, must first obtain approval from China's State Council.

27.    Fourteen years later, following four years of publicly held debates, the NPC passed the second revision to the PRC Securities Law on December 28, 2019. The revised law, which went into effect on March 1, 2020 – just prior to the start of the Class Period – made the licensing requirement for securities brokerage businesses even more explicit, and unequivocally expanded its reach outside China's borders to include emerging online brokerage companies.  Article 2 of the revised law specified:

> Where the issuance and transactions of securities **outside the territory of the People's Republic China** have disrupted the market order within the territory of the People's Republic of China and damaged the legitimate rights and interests of investors within the territory, **such activities shall be handled and investigated for legal responsibility in accordance with the relevant provisions of this Law**.[3]

28.    The 2020 revision to the PRC Securities Law reiterated the licensure requirement and clarified the types of companies required to adhere to the requirement.  The NPC reiterated in Article 118 that: "**No entity or individual shall conduct securities business in the name of a securities company without the approval of the securities regulatory authority under the State Council**."  The NPC outlined the process for a securities company to obtain a license in Article 119, in

---

[3]    A certified translation of the 2020 revised PRC Securities Law is filed herewith as Exhibit C.

which it also restated that: "***Without a permit for securities business, no securities company shall engage in securities business***."  Article 120 explained that: "***Except for securities companies, no other entity or individual shall engage in securities underwriting, securities sponsoring, securities brokerage or margin trading and securities lending***."

29.    Article 160 expanded on this requirement, stating, in relevant part:

> ***Without examination and approval, no one shall provide services for securities transactions and other related activities***.  One who intends to engage in any other securities transaction service shall file the matter for the record with the securities regulatory authority under the State Council and the relevant authorities under the State Council.

30.    The 2020 revision to the PRC Securities Law also defined the consequences for companies that violated the licensure requirement.  In Article 202, the NPC warned that:

> ***Where, in violation of the provisions of Article 118 and the first and the fourth paragraphs of Article 120 of this Law, an entity or individual establishes a securities company without authorization, illegally engages in securities businesses, or conducts securities business activities in the name of a securities company without approval, the entity or individual shall be ordered to take corrective measures***.  Illegal gains shall be confiscated and a fine of not less than one time but not more than ten times the value of the illegal gains shall be imposed.  Where there are no illegal gains or the illegal gains are less than RMB 1 million, a fine of not less than RMB 1 million but not more than RMB 10 million shall be imposed.  The person-in-charge directly responsible and other persons directly responsible shall be given a warning and a fine of not less than RMB 200,000 but not more than RMB 2 million shall be imposed.  ***A securities company established without authorization shall be banned by the securities regulatory authority under the State Council***.

31.    These revisions, which were enacted just prior to the start of the Class Period, removed any conceivable doubt that a company, like Futu, that engages in financial business activities such as securities brokerage, trade execution, and/or securities margin trading, must first obtain a securities business license from the State Council.    Further, the NPC explicitly cautioned that conducting such business activities without a license would result in the company being banned by the securities regulatory authority of the State Council.    This is precisely the fate Futu suffered on May 16, 2023, when the State Council outlawed the use of Futu's apps in China.

C.    **Defendants Received Repeated Warning that Futu's Activities in China Were Illegal**

32.    Defendants received numerous warnings throughout the Class Period that Futu was operating illegally in China before the Chinese government ultimately banned Futu from taking on new clients in the country.

33.    *First*, on October 14, 2021, the official newspaper of the Central Committee of the Chinese Communist Party, *People's Daily*, published an article[4] suggesting that companies like Futu were not in compliance with newly enacted Chinese data-privacy laws.    But even more importantly for purposes of the present litigation, the article further reported that, according to the CSRC, "except for the

---

[4]    The article was entitled: "Financial Observer: The Personal Information Protection Law is About to be Implemented.    Where Will Cross-border Internet Securities Companies Go From Here?"

4866-0813-6347.v2

Qualified Domestic Institutional Investors (QDII) and the 'Shanghai-Hong Kong Stock Connect' mechanism, no domestic or foreign institutions have been approved to provide services for domestic investors to participate in overseas securities transactions."  Analysts and investors understood this to mean that Futu faced impending regulatory action due to its failure to obtain a securities business license in China.  For example, a Bank of America analyst report issued the following day concluded: "Given the rising regulatory uncertainties (especially the license related to mainland China business), we cut our rating to Underperform . . . ."

34.    *Second*, just ten days later, on October 24, 2021, the head of the financial stability department at the PBOC, Sun, spoke at the Bund Summit in Shanghai. During his speech, Sun explicitly stated that "'[c]ross-border online brokerages are driving in China without a driver's license.  *They're conducting illegal financial activities*.'"  He reiterated that "'[f]inancial licenses have national boundaries'" and "'[o]verseas institutions with only overseas licenses conducting business in mainland China is *illegal financial activity*.'"  Although Sun did not identify Futu by name in his speech, when discussing the illegal operators, he specifically referenced Futu's recent share price drops, making clear that one of the illegal operators was Futu. Because Sun was a senior official at China's central bank, numerous media outlets reported on Sun's speech, and made the connection that Futu was one of the companies operating illegally in China.  For example, on October 28, 2021, *The Wall*

- 17 -

*Street Journal* published an article entitled: "Chinese Online Broker Shares Dropped After Criticism From Central Bank." The article reported Futu and another brokerage, Up Fintech Holding Ltd., were both implicated in Sun's speech, noting that "[t]he central banker didn't name the two companies but identified them by referring to recent drops in their share prices."

35.    ***Third***, two months after Sun's speech, on December 17, 2021, *Reuters* released an article entitled: "EXCLUSIVE Next in China regulatory crackdown: online brokers – sources." The *Reuters'* article reported that Futu would be banned from operating in China in "'the coming months.'" The article explained that "Futu [is] registered with the Securities and Futures Commission in Hong Kong but that permit does not extend to the mainland. No mainland licence [sic] exists for online brokerages specializing in cross-border trades, the sources said." Futu's response was also included in the article, which stated that the Company "***had been communicating with Chinese authorities*** but had not received any formal orders along the lines of those suggested by *Reuters* reporting," adding that Futu "was operating normally."

36.    ***Fourth***, roughly one year later, on December 30, 2022, both *Reuters* and *The Wall Street Journal* reported that the CSRC had announced that Futu's securities operations in China were unlawful, and had banned the Company from opening any new investor accounts in China. *The Wall Street Journal* article, entitled: "China Regulator Says Futu, Up Fintech Violated Laws," further reported that CSRC officials

had communicated with Futu's senior executives "in late 2021 **and told them to comply with such laws**."

### D. Defendants Repeatedly Reassured Investors of Futu's Regulatory Compliance

37.     Despite the clear language of the PRC Securities Laws, and the repeated warnings Defendants received that Futu was not in compliance with those laws, Defendants continued to falsely and misleadingly reassure investors – in Futu's public filings and through Defendants' public statements – that the Company was operating in China legally.

38.     The Company's public filings with the SEC during the Class Period included risk disclosures falsely telling investors that while there were "uncertainties" with respect to the applicable PRC Securities Law regulations, Futu was nonetheless in compliance with those laws.  Defendants bolstered these misrepresentations by representing to investors in Futu's SEC filings that the Company's lawyers had determined that Futu was in compliance with relevant Chinese laws and regulations.

39.     Defendants also used the Company's earnings calls as opportunities to falsely reassure investors that Futu was in compliance with the PRC Securities Law. For example, during an earnings call on November 24, 2021, an analyst questioned defendant Chen about the impact on Futu of China's regulations regarding offshore trading by online brokers.  Defendant Chen reassured the analyst that: "***the impact to our client acquisitions in the Great China areas is manageable***. . . .  I think the worst

- 19 -

is already behind us. . . . ***the situation is still within our control***."  And defendant Li (via translation by Yuan) further assured investors that Futu had "always been embracing the regulations," had a "very high set of standards for operational compliance," and was "actively and transparently communicating with the regulators."

40.    Likewise, during a March 28, 2023 earnings call, when analysts again directly asked defendant Chen about the impact of China's regulations regarding offshore trading by online brokers on Futu, he reassured them that Futu had "full cooperation with the regulators" and that the "overall impact is quite manageable."

41.    Finally, Defendants also used corporate press releases to respond to media reports that Futu was acting illegally in China.  For example, on December 17, 2021, in response to several articles reporting that the Company's operations in China were illegal, Futu issued a press release expressly denying the accuracy of those reports and falsely reassuring investors that Futu's operations in China were legal.  In Futu's press release, Defendants falsely assured investors that the Company "always maintain[s] active communication with different competent PRC regulatory authorities in its ordinary course of business," and falsely asserted that: "[t]o date, the Company has not received (nor is it aware of) any notice, guidance or order from any PRC regulatory authorities which is expected to have a material adverse impact on its business operation or financial conditions."

42.    In short, while the Chinese government and U.S. media conveyed to investors throughout the Class Period that Futu was operating in China illegally, Defendants denied these claims, and assured analysts and investors that Futu was in compliance with the applicable Chinese regulations.

### E.    The Truth About Futu Is Finally Revealed

43.    The full truth about the illegality of Futu's operations in China, which Defendants had steadfastly denied throughout the Class Period, was finally revealed on May 16, 2023, the final day of the Class Period.  On that day, news media reported that the Chinese government would be removing Futu's app from stores in China because Futu had been illegally operating a securities brokerage business in China without a license.  When the truth that Futu had long denied was finally revealed, Futu's investors suffered hundreds of millions of dollars in damages.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

44.    During the Class Period, Defendants made false and misleading statements and omitted material facts necessary to make the statements made not false or misleading, including statements that: (a) Futu was in compliance with the applicable regulations in the PRC Securities Law governing securities brokerage businesses in China, while simultaneously claiming that "uncertainties" existed with respect to those regulations; (b) Futu "monitor[ed]" and "embrac[ed]" the applicable regulations in the PRC Securities Law, was "actively and transparently"

- 21 -

communicating with Chinese regulators about those regulations, and would "timely disclos[e]" to investors developments regarding the regulations that "may have a material adverse impact on the Company's business operation[s]"; and (c) Futu's growth prospects in China remained "very strong," while downplaying the negative impacts of the applicable PRC Securities Law as "short term" and "manageable."

### A. Misstatements that Futu Was in Compliance with Applicable Laws

45.     Throughout the Class Period, Defendants falsely and misleadingly told investors that Futu was in compliance with the applicable regulations in the PRC Securities Law governing securities brokerage businesses in China, while simultaneously asserting, also falsely or misleadingly, that those regulations were uncertain and that they did not believe Futu even engaged in securities brokerage business in China.

46.     On April 27, 2020, the first day of the Class Period, Futu filed its Annual Report on SEC Form 20-F for the fiscal year ended December 31, 2019 (the "2019 Annual Report") with the SEC, which stated:

> We do not hold any license or permit for providing securities brokerage business in China. ***Although we do not believe we engage in securities brokerage business in China, there remain uncertainties to the interpretation and implementation of relevant PRC laws and regulations***.
>
> Pursuant to the relevant PRC laws and regulations, no entity or individual shall engage in securities business without the approval of the securities regulatory authority of the State Council.  *See* "Item 4.

- 22 -

Information on the Company – B. Business Overview – Regulations – Overview of the Laws and Regulations Relating to Our Business and Operations in China – Regulations on Securities Business." We do not hold any license or permit in relation to providing securities brokerage business in China. A significant portion of our technology, research and development, management, supporting and other teams are based in China and a large number of our clients are PRC citizens. ***However, we do not believe the business we are conducting now through our subsidiaries or consolidated affiliated entities in China is securities brokerage business in China***. In the past, we received inquiries relating to our business from certain regulatory authorities in China. ***We have since then taken measures to modify and enhance our business and platform to be in compliance with the applicable PRC laws and regulations related to securities brokerage business in China***. However, we cannot assure you that the measures we have taken or will take in the future will be effective or fully satisfy the relevant regulatory authorities' requirements. ***Based on the opinion of our PRC counsel, CM Law Firm, we are in compliance with the applicable PRC laws and regulations related to securities brokerage business in China after such modifications in all material aspects. However, there remain some uncertainties as to how the current and any future PRC laws and regulations will be interpreted or implemented in the context of operating securities related business in China***. We cannot assure you that our current operation model, such as redirecting users and clients to open accounts and make transactions outside China, will not be deemed as operating securities brokerage business in China, which may subject us to further inquiries or rectifications. If certain of our activities in China were deemed by relevant regulators as provision of securities brokerage services, investment consulting services and stock options brokerage business in China, we will be required to obtain relevant licenses or permits from relevant regulatory bodies, including the CSRC, and failure of obtaining such licenses or permits may subject us to regulatory actions and penalties, including fines, suspension of parts or all of our operations in the PRC, and temporary suspension or removal of our websites and mobile application in China. In such cases, our business, financial condition, results of operations and prospects may be materially and adversely affected.

***PRC laws and regulations are evolving, and there are uncertainties relating to the regulation of different aspects of the***

*services we provide through our platforms in China*.  We cannot assure you that we will not be found in violation of any future laws and regulations or any of the laws and regulations currently in effect due to changes in or discrepancies with respect to the relevant authorities' interpretation of these laws and regulations.  In addition, *we may be required to obtain additional license or approvals*, and we cannot assure you that we will be able to timely obtain or maintain all the required licenses or approvals or make all the necessary filings in the future.

47.    Defendants Chen and Li each signed Futu's Annual Reports for 2019, and affirmed therein: "[B]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

48.    Defendants Chen and Li provided substantially similar certifications and statements in Futu's Annual Report on SEC Form 20-F for the year ended December 31, 2020 (the "2020 Annual Report"), filed March 26, 2021, and its Annual Report on SEC Form 20-F for the year ended December 31, 2021 (the "2021 Annual Report"), filed March 18, 2022.  In the 2020 and 2021 Annual Reports, which are nearly identical in relevant part to the 2019 Annual Report, Defendants again falsely and misleadingly stated: "*Although we do not believe we engage in securities brokerage business in China, there remain uncertainties to the interpretation and implementation of relevant PRC laws and regulations*."  And in each, the Company reiterated that based on the advice of PRC-based counsel, Futu was in compliance with relevant PRC Securities Law regulations, and likewise, that "*there are*

*uncertainties relating to the regulation of different aspects of the services we provide through our platforms in China*."

49.     On April 24, 2023, Futu filed its Annual Report on SEC Form 20-F for the fiscal year ended December 31, 2022 (the "2022 Annual Report") with the SEC. In the 2022 Annual Report, which Futu issued just a few months after the CSRC had publicly condemned Futu for violating the PRC Securities Law and had forbidden the Company from acquiring any new clients in China, Defendants finally abandoned their false and misleading representation that Futu was in compliance with the PRC Securities Law, and instead, falsely and misleadingly represented that Futu was taking "rectification measures" to be in compliance with the law.  Further, Defendants continued to falsely and misleadingly insist that uncertainties remained relating to the regulation of different aspects of the services Futu provided in China.

50.     More specifically, in Futu's 2022 Annual Report, Defendants stated:

As announced by the CSRC on December 30, 2022, the CSRC has initiated inquiries on us regarding our cross-border operations in Mainland China, including the provision of cross-border securities services for domestic investors. *As of the date of this annual report, we have limited information to accurately predict if any disciplinary action or punishment will be taken against us and/or our responsible officers after the conclusion of such inquiries, and if so, the nature and extent of any such action.  Although we have been and continue to take rectification measures on our business to be in compliance with laws and regulations and to meet the requirements from the CSRC during the inquiries*, we cannot assure or predict whether the CSRC is satisfied with our rectification measures and whether the CSRC would impose further regulatory actions and penalties on us, including fines, suspension of parts or all of our operations or activities in Mainland

- 25 -

China, or suspension or removal of our websites, desktop devices and mobile applications in China, which, individually or taken as a whole, may affect our client base in China and revenue attribute to such clients, and therefore may have a material and adverse impact on our operations and financial results. *See* "Item 3. Key Information – D. Risk Factors – Risks Related to Our Business and Industry – We do not hold any license or permit for providing securities brokerage services in Mainland China. As announced by the CSRC on December 30, 2022, the CSRC has initiated inquiries on us regarding our cross-border operations in Mainland China, including the provision of cross-border securities services for domestic investors. ***We have taken and may continue to take rectification measures based on our communication with or the requirements from the CSRC***. If the CSRC is not satisfied with our rectification measures or the CSRC imposes other further regulatory actions or penalties on us, our business and results of operations may be materially and adversely affected."

*    *    *

***PRC laws and regulations are evolving, and there are uncertainties relating to the regulation of different aspects of the services we provide through our platforms in China***. We cannot assure you that we will not be found in violation of any future laws and regulations or any of the laws and regulations currently in effect due to changes in or discrepancies with respect to the relevant authorities' interpretation of these laws and regulations. In addition, we may be required to obtain additional license or approvals, and we cannot assure you that we will be able to timely obtain or maintain all the required licenses or approvals or make all the necessary filings in the future.

51.     As they had for each of Futu's prior Annual Reports issued during the Class Period, defendants Chen and Li signed Futu's 2022 Annual Report, affirming that it did not contain untrue statements of material facts or omit any material facts necessary to make the statements contained therein not misleading.

52.     Defendants' statements referenced above in ¶¶45-51, that Futu was in compliance with the applicable PRC Securities Law regulations governing securities

- 26 -

brokerage businesses in China, despite the falsely purported uncertainty of those regulations, were materially false and misleading when made because the true facts, which were then known to and/or recklessly disregarded by Defendants, were:

(a)    Far from being uncertain, the applicable regulations in the PRC Securities Law were clear that a license must be obtained in order to legally operate a securities company in China.

(b)    The PRC Securities Law was also clear that Futu was a "securities company" subject to the PRC Securities Law.  Futu admittedly operated a securities brokerage platform that engaged in "trade execution and margin financing which allow [its] clients to trade securities, such as stocks, warrants, options and exchange-traded funds, or ETFs, across different markets."  The PRC Securities Law explicitly defines a "securities company" as a business that "engage[s] in securities underwriting, securities sponsoring, securities brokerage or margin trading and securities lending."  Accordingly, there was no uncertainty that Futu was a security company under Chinese law, and was therefore required to obtain a license in order to legally operate in China.

(c)    The PRC Securities Law was also clear about the consequences for violating the licensing requirement, stating that "securities companies established without authorization shall be banned by the securities regulatory authority of the State Council."

(d)    There were no "rectification measures" the Company could employ to comply with the law, other than belatedly seeking to obtain the required license, which Defendants had failed to do.

**B.    Misstatements that Futu Was Focused on Ensuring Regulatory Compliance**

53.    Throughout the Class Period, in order to assure investors that Futu was not operating in China illegally, Defendants falsely and misleadingly represented that Futu "monitor[ed]" and "embrac[ed]" the relevant regulations in the PRC Securities Law, was "actively and transparently" communicating with Chinese regulators about those regulations, and would "timely disclos[e]" to investors any developments regarding the regulations that "may have a material adverse impact on the Company's business operation."

54.    During Futu's 3Q21 earnings call on November 24, 2021, Defendants falsely touted the Company's focus on compliance with the relevant provisions of the PRC Securities Law.[5]  More specifically, when an analyst expressed that there were "some concerns about legality of offshore trading by online brokers," and asked whether "management can shed some light on the impact of the government regulation," defendant Li (via translation by Yuan) falsely and misleadingly responded on behalf of the Company as follows:

---

[5]    As used herein, "Q" means the Company's fiscal quarter (*e.g.*, 3Q21 means the third fiscal quarter of the Futu's fiscal year 2021).

[Analyst:] There are some concerns about legality of offshore trading by online brokers. Just wondering if management can shed some light on the impact of the government regulation. Well, especially for customer acquisition in Mainland China, people may feel hesitate to open new accounts due to regulatory concerns. Well, additionally, will that affect your customer acquisition strategy?

*    *    *

[Li (via translation by Yuan):] Yes. ***We are business as usual here at Futu***, and our business model is nothing new. So before our inception, this business has been there for years, and our business size is small relative to the whole industry. So our business model and how we serve our clients are identical to a lot of the other international Hong Kong and China brokers and banks in Hong Kong that help Chinese base access overseas trading, and we are operating under the same set of laws and regulations.

You have to ask through the differences than in comparison to our peers, we invest more heavily into technology and innovation, and we attach more importance to user experience. ***And we have always been embracing the regulations and have a very high set of standards for operational compliance, and we are actively and transparently communicating with the regulators, and we anticipate and welcome more guidance from the regulators*** to both us and the industry as a whole. And if there are new regulatory guidance is coming out, I think we'll abide by these regulations as soon as possible. ***And as a listed company, we'll timely update any new information available to us***.

55.     Just a few weeks later, on December 17, 2021, in response to media reports that Futu was operating illegally in China, Futu issued a press release on its website entitled: "Futu Responds to Media Report," which falsely assured investors that Futu was actively focused on legal compliance, including by stating:

[Futu], a leading tech-driven online brokerage and wealth management platform, today responds to the media speculations regarding potential PRC regulatory policies that may have a material adverse impact on the Company's business operation. As a Nasdaq-

- 29 -

listed company, *Futu is committed to timely disclosing recent developments that may have a material adverse impact on the Company's business operation, including regulatory developments*.

*Futu always maintains active communication with different competent PRC regulatory authorities in its ordinary course of business.  To date, the Company has not received (nor is it aware of) any notice, guidance or order from any PRC regulatory authorities which is expected to have a material adverse impact on its business operation or financial conditions*.  The Company has been operating steadily and will continue to serve existing and new clients.

In terms of serving the PRC clients, Futu has been abiding by the same rules and regulations and adopting the similar industry practices and business models as other brokers who hold the same type of licenses in Hong Kong.  No further innovations or breakthroughs have been made by Futu with respect to the business model.  There is no such "internet broker-dealer" category or definition under relevant legal framework and nowadays almost all broker-dealers are using internet (through App and/or website) to serve their clients.  *Futu will keep monitoring regulatory developments and continue to fully cooperate with relevant regulatory authorities*.

During the recent period, *the Company noticed that some individuals and institutions have been spreading false or fake information about Futu on social media with the purpose of profiting from short-selling*.  We have gathered relevant information and further reported to relevant regulators.  We also reserve our right to take legal action.

We believe that the regulatory authorities in mainland China and Hong Kong have always attached great importance to protecting investors, maintaining a healthy and stable financial market, and prudently formulating policies and guiding the industry.  We caution the media and the public to distinguish false and fake information and avoid being taken advantage of.

56.    During the Company's 4Q22 earnings call on March 28, 2023,

Defendants continued to tout Futu's purported focus on complying with the PRC

Securities Law.  More specifically, in response to an analyst question concerning the impact of the CSRC's declaration in December 2022 that Futu was violating certain provisions of the PRC Securities Law, defendant Chen falsely and misleadingly responded:

> [Analyst:] So we understood that there is a CSRC announcement on tightening of the offshore brokers.  And we wish to understand what's the impact on Futu's business operation, in particular, does Futu see any current AUM outflow fall in the CSRC announcement last December?
>
> *    *    *
>
> [Chen:] Secondly, ***regarding the CSRC's news at the end of last year, I think we – number one, we fully accept the regulator's point of view, and we have a full cooperation with the regulators.  On a net-to-net basis, we do think it will be healthy for the industry's long-term growth***.  And also, if you follow you, there are some clarities from the CSRC spokesperson in the middle of February, mentioning how to deal with the existing clients.  They ask for orderly deal with the existing clients.  It will be an industry-wide situation.  So we will take a very constructive manners to cooperate with the regulators in this regard.

57.    The statements referenced above in ¶¶53-56 were materially false and misleading when made because the true facts, which were then known to and/or recklessly disregarded by Defendants, were:

(a)    Futu was not "embracing the regulations" and did not "have a very high set of standards for operational compliance."  The applicable regulations in the PRC Securities Law were clear that Futu was a securities business, and that, as such, it was required to obtain a license before engaging in securities business in China.  Yet, Defendants had blatantly flouted these regulations, making no effort to obtain the

- 31 -

license required by the law, and instead, illogically insisting – despite the law's clear language to the contrary – that Futu was not a securities business and that the licensure requirement therefore did not apply to Futu.  Defendants' claims of cooperation and a high standard of compliance were farcical.

(b)    Defendants were not candid with investors about regulatory developments "that may have a material adverse impact on the Company's business operation."  And they falsely and misleadingly stated that they were not aware of "any notice, guidance or order from any PRC regulatory authorities which is expected to have a material adverse impact on its business operation or financial conditions."  In reality, as *The Wall Street Journal* and *Reuters* both reported, the CSRC had told "senior executives" at the Company in late-2021 that Futu's "act of offering offshore securities-trading services to clients in mainland China doesn't comply with the country's laws and regulations," and had warned them that Futu needed to comply with such laws.  Defendants did not disclose these material, adverse developments to investors as promised, and instead, misleadingly withheld negative information about Futu's non-compliance with the PRC Securities Law and falsely assured investors that Futu was operating in China legally.

## C.    Misstatements Regarding Futu's Growth Prospects in China and Downplaying the Impact of the Regulations

58.    Throughout the Class Period, Defendants misleadingly downplayed the adverse impact that the applicable PRC Securities Law had on Futu's ability to do

business in China – one of Futu's primary markets – falsely assuring investors that Futu's growth prospects in that market remained "very strong."

59.     On Futu's 3Q20 earnings call, which took place on November 19, 2020, in response to a specific question about Futu's growth prospects in China, Futu's Senior Vice President, Xu, stated on behalf of the Company (via translation by Yuan):

> [Analyst:] So what will be our strategy in the future to acquire the mainland China users, which seems to be – have a larger user base that we could explore into?
>
> *     *     *
>
> [Xu (via translation by Yuan):] And with regards to our mainland client acquisition, I think we use different client acquisition strategies because of the number of constraints.  For example, like ESOP continues to contribute a very steady stream high-quality clients and word-of-mouth referral is more meaningful in mainland than in Hong Kong in terms of our absolute paying client contribution.  So we have different client acquisition strategies for mainland, and *we think the growth prospects in mainland are very strong*.

60.     During Futu's 3Q21 earnings call on November 24, 2021, Defendants again downplayed the impact of the PRC Securities Law on Futu's ability to acquire clients in China.  In response to specific questions from an analyst who expressed concern about the legality of Futu's operations in China and asked management to "shed some light on the impact of the government regulation . . . especially for customer acquisition in Mainland China," defendant Chen stated on behalf of the Company:

> [Analyst:] There are some concerns about legality of offshore trading by online brokers.  Just wondering if management can shed some light on

- 33 -

the impact of the government regulation.  Well, especially for customer acquisition in Mainland China, people may feel hesitate to open new accounts due to the regulatory concerns.  Well, additionally, will that affect your customer acquisition strategy?

*　　　*　　　*

[Chen:] ***Overall speaking, we think the impact is still very short term and manageable*** from mid – from the mid-October to mid-November, the net asset outflows accounts for less than 2% of our total client assets.  And the situation started back normal from last week.  In my personal thought, ***I think the worst is already behind us***.  Of course, the market volatility alongside with seasonality effect in Q4, together with this headline news, definitely enhanced attrition rate for existing paying clients and also create some challenges for new client acquisition across the board in the near term.  ***But we think the overall speaking, the situation is still within our control***.

61.    On March 28, 2023, after the Chinese government had publicly condemned Futu for operating illegally in China and had forbidden the Company from acquiring any new clients there, Futu held its 4Q22 earnings call.  During this call, Defendants downplayed the impact of these adverse developments on Futu's ability to grow its client base in China, and upon the Company's business as a whole.  Defendant Chen falsely and misleadingly responded on behalf of the Company to a question specifically asking about the impact of Chinese regulations on Futu's client growth prospects in China as follows:

[Analyst:] So we understood that there is a CSRC announcement on tightening of the offshore brokers.  And we wish to understand what's the impact on Futu's business operation, in particular, does Futu see any current AUM [assets under management] outflow fall in the CSRC announcement last December?

[Chen:] Let me answer your question. First of all, I'll give you some general color about our client's movement following the end of last year's news flow. We do witness some our Hong Kong clients because of the – there are some sentiment concerns, there are some client outflows in – particularly in the first half of January. ***But I think the overall amount is quite manageable***. Roughly, I think the net outflow at the time accounts for roughly 1% to 2% of our total client assets, which, ***compared with the situation we faced and at the end of 2021, we think the situation was manageable***.

And the net outflow conditional situation gradually reversed starting from February. And nowadays, we record daily asset inflows.

62.     Defendants' statements referenced above in ¶¶58-61, downplaying the negative impact of the PRC Securities Law on Futu's business as "manageable," "short term" and "still within our control," while maintaining that the Company's growth prospects in China were "very strong," were materially false and misleading for numerous reasons, including:

(a)     Defendants knew or recklessly disregarded that Futu was operating a securities brokerage business in China, without the required Chinese permit, which was illegal;

(b)     Defendants knew or recklessly disregarded that the consequences for such illegal activity – which were clearly delineated in the PRC Securities Law and included banishment from the Chinese market – were severe, long term and entirely within the control of the Chinese government, not Futu;

(c)     Defendants knew or recklessly disregarded that when China banished Futu from operating in China as a result of Futu's illegal conduct, Futu's

- 35 -

growth in one of its largest markets – China – would be non-existent, rather than "very strong" as Defendants ridiculously maintained; and

(d)    When Defendants made the false and misleading statements in ¶61, they knew or recklessly disregarded that Futu's situation in China was not "manageable," as Chinese regulators had already publicly decreed that Futu was operating illegally in China, and had banned Futu from acquiring any new clients in China.

## VI.    ADDITIONAL EVIDENCE OF SCIENTER

### A.    The Fraud Infected Futu's Core Operations, Which Defendants Closely Monitored

63.    Futu's operations in China were admittedly central to the Company's financial performance.  As Xu explained on the Company's August 13, 2020 earnings call (via translation by Yuan), "about 70% of our paying clients were from Mainland [China] and 30% from Hong Kong."  And although Futu started to expand to other countries, its dependence on China continued well into the Class Period.  For example, on May 19, 2021, defendant Chen noted that 75% of Futu's new business was "almost evenly split within Mainland China and also Hong Kong."  Futu's ability to grow and justify its climbing ADS price largely depended on maintaining its robust business in China.

**B.    Defendants Regularly Corresponded with Regulatory Authorities Who Believed Futu Was Acting "Illegally"**

64.    Defendants admitted repeatedly that they directly communicated with Chinese regulatory authorities about the legality of Futu's business.  According to Defendants' public filings, Futu "always maintains active communication with different competent PRC regulatory authorities in its ordinary course of business." According to *The Wall Street Journal*, the CSRC said that Futu's "act of offering offshore securities-trading services to clients in mainland China doesn't comply with the country's laws and regulations," and the CSRC told "senior executives" at Futu in late-2021 that the Company needed to comply with such laws.  Further, *Reuters* reported on December 17, 2021, that Futu executives were lobbying authorities including the CSRC, the State Administration of Foreign Exchange, and the Central Bank of China, "but have yet to receive any positive feedback."  Given Defendants' regular correspondence with Chinese regulators, who deemed Futu's brokerage business to be illegal, Defendants cannot plausibly claim ignorance of the impending crackdown by Chinese regulators on Futu's blatantly illegal securities brokerage activities in China.

**C.    The Temporal Proximity Between Defendants' Misstatements and the Corrective Disclosures Further Supports Scienter**

65.    In Futu's 2020 Annual Report, filed March 26, 2021, Defendants assured investors that, according to the Company's PRC lawyers: "we are in compliance with

- 37 -

the applicable PRC laws and regulations related to securities brokerage business in China after such modifications in all material aspects."  Just six months later, on October 24, 2021, a prominent Chinese regulator concluded the opposite, finding "[t]hey're conducting illegal financial activities.'"  Less than two months later, Defendants continued to insist in a press release on December 17, 2021, that the Company had not received and was not aware of "any notice, guidance or order from any PRC regulatory authorities which is expected to have a material adverse impact on its business operation or financial conditions."

66.    In Futu's 2021 Annual Report, filed March 18, 2022, Defendants continued to insist that Futu's PRC Counsel determined they were not in violation of the "current applicable PRC laws and regulations related to securities brokerage business in China *in any material aspects*."  But, in December 2022, the CSRC stated that Defendants *violated the law* by allowing customers in China to make cross-border trades, and, as a consequence, the Company would be banned from taking on or soliciting new customers in China.  Yet despite this significant, adverse development, during Futu's 1Q23 earnings call held just three months later on March 28, 2023, defendant Chen falsely and misleadingly told investors that the impact on the Company's business was "quite manageable."  And while claiming to fully cooperate with Chinese regulators, defendant Chen also misleadingly insisted that the CSRC announcement would actually "be healthy for the industry's long-term growth."

67.    As late as April 24, 2023, Futu persisted in its campaign to convince investors that the PRC Securities Law was uncertain about whether its operations in China constituted securities brokerage business and therefore required the Company to obtain a license before operating in China.  In Futu's 2022 Annual Report (filed April 24, 2023), Defendants stated that regulatory approval "may be required" under the PRC Securities Law, while stressing that the Company had been and continued to "take rectification measures" to be in compliance with the PRC Securities Law.  Less than one month later, on May 16, 2023, Defendants announced that Futu's apps were being removed from app stores in China.  This announcement occurred just *weeks* after Defendants reiterated their focus on regulatory compliance in China.

68.    The close proximity of these statements to the related disclosures supports a reasonable inference that Defendants were aware of, or recklessly disregarded, that Futu was not and could not comply with the applicable PRC Securities Law, when they assured investors otherwise throughout the Class Period.

### D.    Defendants Signed Sarbanes-Oxley Certifications Attesting that They Personally Supervised Futu's Controls and Procedures

69.    In each of the Annual Reports referenced herein, the Individual Defendants certified that they personally supervised and participated in the evaluation of Futu's financial controls and procedures, and that the Company's financial disclosures fairly and accurately presented its financial condition.  In addition, each of

- 39 -

the Individual Defendants certified that they were "responsible for establishing and maintaining disclosure controls and procedures" and that such controls and procedures ensured that "material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared."

## VII. SCHEME LIABILITY

70. Defendants engaged in a scheme to circumvent the PRC Securities Law by failing to obtain a brokerage license, and then convincing investors that a license was not necessary to operate their business in the country. This conduct caused the price of Futu ADS to trade at artificial levels during the Class Period, as the market was unaware that Futu's operations in China constituted illegal financial activity. Each Defendant is liable as a participant in the fraudulent scheme described herein.

## VIII. LOSS CAUSATION

71. The market for Futu ADS was open, well-developed, and efficient at all relevant times. Throughout the Class Period, Futu ADS traded at artificially inflated prices as a direct result of Defendants' scheme and their materially misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public. Plaintiffs and other members of the Class purchased or otherwise acquired Futu ADS relying upon the integrity of the market price and market information relating to Futu and its business.

4866-0813-6347.v2

72.     Defendants' misrepresentations and fraudulent conduct became apparent to the market through four separate disclosures.  In each instance, the price of Futu's ADS immediately declined as the artificial inflation was removed from the market price of the securities, causing substantial damage to Plaintiffs and the Class.

73.     On October 14, 2021, *People's Daily* – which *The Wall Street Journal* describes as "Chinese State media" – published an article entitled: "Financial Observer: The Personal Information Protection Law is About to be Implemented. Where Will Cross-border Internet Securities Companies Go From Here?" by Sun Yang Li Qiaochu.  The article relayed information from the CSRC finding that "except for the Qualified Domestic Institutional Investors (QDII) and the 'Shanghai-Hong Kong Stock Connect' mechanism, no domestic or foreign institutions have been approved to provide services for domestic investors to participate in overseas securities transactions."  In other words, the article informed investors that, contrary to Defendants' representations about their conversations with regulators and compliance with regulations, Futu had been operating in China without the Chinese government's approval.

74.     In response to this news, the price of Futu ADS closed down $10.46 per share, or 12.4%, on October 14, 2021.  Futu's share price continued to fall on October 15, 2021, closing down another $10.08 per share, or 13.7%.  Both days had abnormally high trading volumes of over ***seven times*** the median volume during the

- 41 -

Class Period.  In stark contrast to these price declines, relevant indices increased in price or stayed relatively flat during the same two-day period.  The NASDAQ Golden Dragon China Index decreased by just 1.2% on October 14, 2021, and then ***increased*** by 1.1% on October 15, 2021.  Likewise, the Global Broker Index[6] ***increased*** by 1.2% and 2.0% sequentially.

75.    Analysts immediately attributed Futu's share price drops to the *People's Daily* disclosure.  On October 15, 2021, an analyst from Bank of America issued a report noting that "[t]he official People's Daily published an article on its website yesterday, claiming that cross-border online brokers, like Futu and Tiger, face regulatory risks" and stating: "[W]e believe the key overhang remains the license of [Futu's] mainland China business."  The report concluded: "Given the rising regulatory uncertainties (especially the license related to mainland China business), we cut our rating to Underperform . . . ."

76.    Despite these significant declines in the price of Futu ADS, the price remained inflated because Defendants insisted that the law clearly prohibiting unlicensed brokers contained "uncertainties," and that Futu was actually in compliance.  Indeed, in the same Bank of America report, the analyst acknowledged that "CSRC hasn't approved any institution to provide overseas brokerage services to

---

[6]    The Global Broker Index includes the Charles Schwab Corporation and Interactive Broker Group, equally weighted.

domestic investors," but parroted Defendants' assurances that "[t]his is a grey area for all participants in the industry since the emergence of this business," and called the prospects of a complete ban "an extreme case." Similarly, on the same date, a Credit Suisse analyst cited the "worst-case scenario, in which FUTU may not be able to provide Mainland users with access to the US market," but claimed such a result would be "unlikely."

77.    On October 24, 2021, the head of the financial stability department at the PBOC, Sun, told a forum in Shanghai that "'[c]ross-border online brokerages are driving in China without a driver's license. *They're conducting illegal financial activities*.'" He reiterated that "'[f]inancial licenses have national boundaries'" and "'[o]verseas institutions with only overseas licenses conducting business in mainland China is *illegal financial activity*.'" Days later, the transcript of Sun's speech leaked to financial reporters at *The Wall Street Journal* and *Reuters*, who published articles about the speech on October 28, 2021. The *Reuters*' article included the quotes mentioned above and also noted that Sun's comments represented "the first official comments following recent media reports flagging regulatory risks facing online brokers."

78.    In response to this news, the price of Futu ADS closed down $8.55 per share, or 12.8%, on October 28, 2021, with a trading volume of over *ten times* the median volume. In stark contrast to these price declines, relevant indices stayed

relatively flat during the same period.  The NASDAQ Golden Dragon China Index *increased* by 0.5% and the Global Broker Index decreased by just 0.3%.

79.    Market analysts attributed the drop in Futu's ADS price to the new information from Sun.  On October 28, 2021, an analyst from Jeffries noted that "Futu's share price has dropped by more than 20% premarket," and identified Sun's statements as the cause for the drop.  Again, however, the analyst echoed Defendants' false and misleading claims of "uncertainties" in the law, saying "we still need to wait for more guidelines from the regulators to address these concerns" about Futu's business model.  Indeed, immediately following the news from Sun, Defendants met with market analysts to assuage concerns.  According to a Credit Suisse report on November 3, 2021, Futu struck a "[p]ositive" tone and attempted to assure investors that it could continue to operate in China with only a Hong Kong brokerage license.

80.    On December 30, 2022, the CSRC expressly identified Futu as out of compliance with Chinese securities laws.  According to an article published in *The Wall Street Journal* the same day, "[t]he CSRC said the online brokers' act of offering offshore securities-trading services to clients in mainland China doesn't comply with the country's laws and regulations."  *The Wall Street Journal* further reported that the CSRC "also said it was requiring Futu . . . to *stop taking on or soliciting new domestic clients and customers, who aren't allowed to open accounts*."  *Reuters* corroborated *The Wall Street Journal's* account, similarly reporting on December 30,

2022: "China's securities regulator said on Friday that online brokerages Futu Holding and UP Fintech Holding have conducted unlawful securities businesses, and will be banned from opening new accounts from mainland Chinese investors, sending their shares tumbling." *Reuters* further reported that "[t]he long-awaited official penalty comes more than a year after Chinese official media warned that New York-listed Futu and UP Fintech, which do not have licenses in China, face regulatory risks."

81.    In response to this news, the price of Futu ADS closed down $18.26 per share, or 31.0%, on December 30, 2022, with a trading volume of over ***eight times*** the median volume.  The Futu ADS price continued to fall on the next trading day, January 3, 2023, falling $2.81, or 6.9%, on a trading volume over ***three times*** the median volume.  In stark contrast to these price declines, relevant indices increased or stayed relatively flat during the same period.  The NASDAQ Golden Dragon China Index decreased by just 1.0% on December 30, 2022 and ***increased*** by 3.8% on January 3, 2023.  The Global Broker Index decreased by just 0.04% and 1.5% sequentially.

82.    Analysts again attributed the drop in ADS price to the news.  On December 31, 2022, a Bank of America analyst issued a report that discussed the CSRC statements concerning "illegal cross-border acts," changed its rating to "[u]nderperform," and noted "this is the first time that CSRC has officially made a

statement on this issue." Likewise, a J.P. Morgan analyst called the CSRC action "a negative surprise."

83.     But Futu continued to provide false assurances that its business in China could continue. According to the J.P Morgan analyst, Futu claimed "it will cooperate with the CSRC and ***comply with all applicable rules and regulations***." And the Bank of America analyst remained optimistic about a potential "best-case scenario" where "existing China clients can continue to trade and may even be able to deposit new funds via compliant channels."

84.     This hope was extinguished on May 16, 2023, when *Reuters* reported that Futu "will remove apps in mainland China amid Beijing's sharpened focus on data security and capital outflows." This action would cut off access to investors – particularly younger investors, the company's target market – who used the app to effectuate trades. Indeed, the *Reuters*' article noted that the action "would bar a large number of potential retail investors in mainland China from trading securities easily in markets such as the U.S. and Hong Kong." The following day, a Credit Suisse analyst noted that the "Futubull App will no longer be available on domestic App stores, in response to CSRC's requirements." The analyst called the development "a negative surprise to the market," and cautioned that "[l]ooking ahead, further rectification measure, ***if any***, is a key concern of investors."

4866-0813-6347.v2

85.     On this news, Futu ADS declined $1.91 per share, or 4.4%, on trading volumes **_nearly double_** the median volume.  By contrast, the NASDAQ Golden Dragon Trading Index declined just 0.5% and the Global Broker Index declined 2.0%.

86.     In sum, each of the four declines listed above served to remove the artificial inflation from the price of Futu's ADS, and were direct and foreseeable consequences of the revelation of the relevant truth concealed by Defendants.

## IX.    NO SAFE HARBOR

87.     The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint.

88.     None of the statements complained of herein was a forward-looking statement.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about regulatory compliance.

89.     To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Futu's regulatory compliance.  Given the then-existing facts contradicting Defendants' statements, any

- 47 -

generalized risk disclosures made by Futu were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

90.     To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those materially false and misleading forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or the false and misleading forward-looking statement was authorized and/or approved by an executive officer of Futu who knew that the statement was false or misleading when made.

## X.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

91.     Plaintiffs and members of the putative Class are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Futu ADS was open, efficient and well developed for the following reasons, among others:

(a)     Futu ADS met the requirements for cross-listing, and were cross-listed and actively traded on the NASDAQ Global Market, a highly efficient and automated market;

(b)     The price of Futu ADS reacted promptly to the dissemination of new information regarding the Company.  Futu ADS were actively traded throughout the Class Period, with substantial trading volume and average weekly turnover and

- 48 -

high institutional investor participation. The average daily trading volume for Futu ADS during the Class Period was over 4.4 million ADS, and the average weekly volume as a percentage of ADS outstanding was between 29.3% and 41.6%;

(c)    As a regulated issuer, Futu filed periodic reports with the SEC and the NASDAQ Global Market;

(d)    Futu regularly communicated with public investors via established market-communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e)    Futu was followed extensively by the media, and by numerous securities analysts employed by major brokerage firms who wrote analyst reports about Futu during the Class Period that were distributed to those brokerage firms' sales forces and certain customers. Each of those reports was publicly available and entered the public marketplace.

92.    As a result of the foregoing, the market for Futu ADS promptly digested current information regarding Futu from all publicly available sources and reflected such information in the price of Futu ADS. Under these circumstances, all purchasers of Futu ADS during the Class Period suffered similar injury through their purchase of Futu ADS at artificially inflated prices and the presumption of reliance applies.

- 49 -

93.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding Futu's regulatory compliance – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.   All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of Futu's regulatory compliance, as set forth above, that requirement is satisfied here.

## XI.    PLAINTIFFS' CLASS ACTION ALLEGATIONS

94.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired the ADS of Futu during the Class Period (the "Class").   Excluded from the Class are Defendants and their families and directors and officers of Futu and their families and affiliates.

95.    The members of the Class are so numerous that joinder of all members is impracticable.   The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.   As of May 16, 2023, Futu had over 51.6 million ADS outstanding, owned by hundreds or thousands of investors.

96.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether Defendants violated the Exchange Act;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)     Whether Defendants engaged in a scheme to deceive investors;

(f)     Whether the price of Futu ADS was artificially inflated;

(g)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(h)     The extent of damage sustained by Class members and the appropriate measure of damages.

97.     Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

98.    Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

99.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.    Joinder of all Class members is impracticable.  In addition, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5(a)-(c) Promulgated Thereunder Against All Defendants

100.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

101.    During the Class Period, defendants Futu, Chen, and Li carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Futu ADS at artificially inflated prices.

102.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts

- 52 -

necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ADS in an effort to maintain artificially high market prices for Futu ADS in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

103.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

104.   During the Class Period, Defendants made the false and misleading statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

105.   Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants engaged in this misconduct to conceal Futu's true condition from the investing public and to support the artificially inflated prices of the Company's ADS.

- 53 -

106.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Futu ADS.  Plaintiffs and the Class would not have purchased the Company's ADS at the prices they paid, or at all, had they been aware that the market prices for Futu ADS had been artificially inflated by Defendants' fraudulent course of conduct.

107.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's ADS during the Class Period.

108.    By virtue of the foregoing, Defendants violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against All Defendants

109.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

110.    During the Class Period, the Individual Defendants participated in and oversaw the operation and management of Futu, and conducted and participated, directly and indirectly, in the conduct of Futu's business affairs.

111.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to

Futu's financial condition and results of operations, and to correct promptly any public statements issued by Futu that had become materially false or misleading.

112.  Each of the Individual Defendants, therefore, acted as a controlling person of Futu.  By reason of their senior management positions and/or being directors, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Futu to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over Futu's operations and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complaint.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Futu to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of Futu within the meaning of §20(a) of the Exchange Act.

113.  Futu had the power to control and influence the Individual Defendants, and other Company executives through its power to hire, fire, supervise, and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation, and other employment considerations.  By virtue of the foregoing, Futu had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Individual Defendants, including the content of their public statements.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

DATED:  January 16, 2024          SEEGER WEISS LLP
                                  CHRISTOPHER A. SEEGER
                                  CHRISTOPHER L. AYERS


                                  *s/ Christopher A. Seeger*
                                  ────────────────────────
                                  Christopher A. Seeger

- 56 -

4866-0813-6347.v2

55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  973/639-9100
973/679-8656 (fax)
cseeger@seegerweiss.com
cayers@seegerweiss.com

Liaison Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
JESSICA T. SHINNEFIELD
(admitted *pro hac vice*)
JEFFREY J. STEIN
(admitted *pro hac vice*)
JEREMY W. DANIELS
(admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
jshinnefield@rgrdlaw.com
jstein@rgrdlaw.com
jdaniels@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2024, the foregoing Amended Complaint for Violations of the Federal Securities Laws, was electronically filed by using the Court's CM/ECF system, and accordingly served all parties who receive notice of the filing via the Court's CM/ECF system.

*s/ Christopher A. seeger*
CHRISTOPHER A. SEEGER