<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| JENNIFER HENRY, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> FUTU HOLDINGS LIMITED, *et al.*, <br><br> Defendants. | Case No. 2:23-cv-03222 (BRM) (CLW) <br><br> **OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6) filed by Defendant Futu Holdings Limited ("Futu") (ECF No. 37) and joined by Individual Defendants Arthur Yu Chen ("Chen") and Leaf Hua Li ("Li") (collectively, "Defendants") (ECF Nos. 41, 44). Lead Plaintiffs[1] Treasurer of the State of North Carolina—on behalf of the North Carolina Retirement Systems, the North Carolina Department of State Treasurer, and the North Carolina Supplemental Retirement Board of Trustees, on behalf of the North Carolina Supplemental Retirement Plans ("North Carolina Funds")—and the Indiana Public Retirement System ("Indiana PRS"), individually and on behalf of all other persons similarly situated (collectively, "Plaintiffs") filed an Opposition (ECF No. 39), and Defendants filed a Reply (ECF No. 42). Having reviewed the submissions filed in connection with Defendants' Motion and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the

---

[1] On November 16, 2023, the Court issued an Order appointing lead plaintiffs and approving lead counsel and liaison counsel, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") and 15 U.S.C. §78u-4 (1997). (ECF No. 30.)

reasons set forth below and for good cause having been shown, Defendants' Motions to Dismiss (ECF Nos. 37, 41, and 44) are **GRANTED**.

## I.    BACKGROUND

### A.  Factual Background

For the purpose of this Motion to Dismiss, the Court accepts the factual allegations in the Amended Complaint as true and draws all inferences in the light most favorable to Plaintiffs. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). The Court may also consider any "document *integral to or explicitly relied* upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Digit. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).[2]

This action is a putative class action arising out of alleged violations of the federal securities laws—specifically Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. (*See generally* ECF No. 36 (Am. Compl.).) Futu is a technology company that offers a fully digitalized securities brokerage platform to investors, which is either called either *Futubull* or *Moomoo*, depending on the market. (*Id.*

---

[2] The factual background is taken from the allegations in the Amended Complaint (ECF No. 36), as well as the exhibits Defendants submitted in support of their Motion (*see* ECF Nos. 37-3 through 37-27). The Court considers these exhibits in deciding Defendants' Motion because Plaintiffs' claims rely on these documents (*see* ECF No. 36) and because Plaintiffs do not appear to object to the Court considering these documents (*see* ECF No. 39). Courts can consider any "document *integral to or explicitly relied* upon in the complaint." *In re Burlington*, 114 F.3d at 1426 (citation omitted). A district court may also consider any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted). *See also Aliano v. Twp. of Maplewood*, Civ. A. No. 22-05598, 2023 WL 4398493, at *3 (D.N.J. July 7, 2023) ("Documents attached by a defendant to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim." (citing *Cooper v. Samsung Elecs. Am., Inc.*, 374 F. App'x 250, 253 n.3 (3d Cir. 2010))).

¶¶ 2, 16.) Futu's American Depository Shares ("ADS") are listed on NASDAQ under ticker symbol FUTU. (*Id.* ¶ 16.) Futu is incorporated in the Cayman Islands and has its principal place of business in Hong Kong. (*Id.*) Li is the founder and Chief Executive Officer ("CEO") of Futu and served as Futu's Board of Directors Chairman during the Class Period. (*Id.* ¶ 17.) Chen is Futu's Chief Financial Officer ("CFO"). (*Id.* ¶ 18.) Plaintiffs are putative class members consisting of all persons, excluding Defendants and their families, directors, officers, and affiliates, who purchased or otherwise acquired Futu ADS between April 27, 2020 and May 16, 2023 (the "Class Period") and who suffered damages as a result of Defendants' alleged conduct. (*Id.* ¶¶ 1, 94.) The North Carolina Funds and Indiana PRS are entities who purchased Futu ADS at allegedly artificially inflated prices during the Class Period and suffered damages as a result. (*Id.* ¶¶ 16–17.)

"[T]hrough its proprietary digital platforms, *Futubull* and *Moomoo*, Futu provides a full range of brokerage services, including 'trade execution and margin financing which allow [its] clients to trade securities, such as stocks, warrants, options and exchange-traded funds, or ETFs, across different markets.'" (*Id.* ¶ 21 (second alteration in original).) Futu provided online brokerage services in the Peoples Republic of China ("PRC" or "China"), and during the Class Period, China and Hong Kong were the two primary markets for Futu's brokerage services. (*Id.* ¶¶ 2, 4, 22.) Plaintiffs allege Defendants—through its SEC filings, press releases, and on earnings calls—falsely assured investors that Futu's securities brokerage operations in China complied with applicable Chinese securities laws and regulations, when in fact Futu was illegally operating in China without the required brokerage firm license. (*See generally* ECF No. 36.)

The Chinese government prohibits securities brokerage companies from operating in China without a license. (*Id.* ¶ 23.) On December 29, 1998, the National People's Congress (the "NPC") in China issued the first version of China's Securities Law (the "PRC Securities Law"), "which

established comprehensive regulatory rules for the issuance and trading of securities" and became effective July 1, 1999. (*Id.*) Among other things, the PRC Securities Law "required that brokerage firms apply for and obtain licenses from the PRC State Council in order to operate in China[.]" (*Id.* ¶ 3; *see also id.* ¶ 23.) For example, Article 117 of the PRC Securities Law[3] provides: "The establishment of a securities company must be examined and approved by the State Council's securities regulatory body. Without the approval of this institution, no one is allowed to engage in securities business." (*Id.*) Similarly, Article 118 similarly states in relevant part: "No entity or individual shall conduct securities business in the name of a securities company without the approval of the securities regulatory authority under the State Council." (*Id.* ¶ 28.) Article 131 likewise provides: "Securities companies shall submit application for the scope of business allowed to the State Council securities regulatory body for approval in accordance with the provisions specified in the preceding two articles" and "shall not operate securities or other types of business beyond the approved scope of business." (*Id.* ¶ 23.) Additionally, Article 160 states in relevant part: "Without examination and approval, no one shall provide services for securities transactions and other related activities." (*Id.* ¶ 29.)

Article 119 describes the process for how securities companies can obtain the required license. (*Id.* ¶ 23.) Article 202 of the PRC Securities Law describes the consequences for companies who violate this licensing requirement, stating in relevant part: "Where . . . an entity or individual establishes a securities company without authorization, illegally engages in securities businesses, or conducts securities business activities in the name of a securities company without

---

[3] Plaintiffs provided the Court with a certified English translation of the PRC Securities Law from its original form in Chinese, attached as an exhibit to the Amended Complaint. (*See* ECF No. 36-3). Articles 117 and 131 were not included in the translation. (*See id.*) Nevertheless, for purposes of this Motion, the Court uses Plaintiffs' translation.

approval, the entity or individual shall be ordered to take corrective measures" and that "[a] securities company established without authorization shall be banned by the securities regulatory authority under the State Council." (*Id.* ¶ 30). Subsequent revisions to these regulations in the PRC Securities Law likewise describe this licensing requirement. (*Id.* ¶ 25.)

On March 1, 2020, prior to the beginning of the Class Period, the NPC enacted an amendment to the PRC Securities Law, Article 2, which "clarified that the reach of the law extended to 'securities issuance and trading activities outside the territory of [China]' that 'disrupt the order of the market within the territory of [China].'" (*Id.* ¶ 4.) Specifically, Article 2 states in relevant part:

> This Law shall apply to the issuance and transaction of stocks, corporate bonds, depository receipts and other securities lawfully recognized by the State Council within the territory of the People's Republic of China. Where there are no such provisions in this Law, the provisions of the Company Law of the People's Republic of China and other laws and administrative regulations shall apply. . . . Where the issuance and transactions of securities outside the territory of the People's Republic China have disrupted the market order within the territory of the People's Republic of China and damaged the legitimate rights and interests of investors within the territory, such activities shall be handled and investigated for legal responsibility in accordance with the relevant provisions of this Law.

(ECF No. 36-3 at 4.)

Plaintiffs allege that despite the PRC Securities Laws' "clear language," Defendants falsely and misleadingly reassured investors that it "was operating in China legally." (ECF No. 36 ¶ 37.) Plaintiffs further allege Defendants did not take any steps to obtain the required brokerage license despite a series of four "clear warnings" that Futu was illegally operating in China. (*Id.* ¶ 5.) First, in October 2021, Chinese regulators began focusing on securities brokerages operating illegally in

China without the required license. (*Id.* ¶ 5.) On October 14, 2021, *People's Daily*[4] reported, in an article entitled, "*Financial Observer: The Personal Information Protection Law is About to be Implemented. Where Will Cross-border Internet Securities Companies Go From Here?*",[5] that "it had learned from the China Securities Regulatory Commission ('CSRC')—which is the Chinese equivalent to the SEC in the United States—that 'no domestic or foreign institutions have been approved to provide services for domestic investors to participate in overseas securities transactions.'" (*Id.* ¶¶ 5, 33 & n.4.) The article stated that "according to the CSRC, 'except for the Qualified Domestic Institutional Investors (QDII) and the "Shanghai-Hong Kong Stock Connect" mechanism, no domestic or foreign institutions have been approved to provide services for domestic investors to participate in overseas securities transactions.'" (*Id.* ¶ 33.) Investors and analysts understood this to mean "Futu faced impending regulatory action due to its failure to obtain a securities business license in China." (*Id.*) Upon this news, the price of Futu's ADS closed down 12.4% on October 14, 2021 and "continued to fall on October 15, 2021, closing down another $10.08 per share, or 13.7%." (*Id.* ¶ 74.) Both October 14, 2021 and October 15, 2021 "had abnormally high trading volumes of over seven times the median volume during the Class Period." (*Id.*)

Second, on October 24, 2021, ten days after the *People's Daily* article came out, China's head of the financial stability department of the People's Bank of China ("PBOC") Tianqi Sun

---

[4] According to Plaintiffs, *People's Daily* is "the official newspaper of the Central Committee of the Chinese Communist Party," "has a circulation of over 3 million," and "is widely considered the official voice of the central government of China." (ECF No. 36 ¶ 5 & n.2.)

[5] The Court was not provided with a certified translated copy of this article. To the extent Plaintiff quotes from it, the Court accepts it as accurate unless otherwise stated.

("Sun") spoke[6] in Shanghai at the Bund Summit where he stated in part: "Cross-border online brokerages are driving in China without a driver's license. They're conducting illegal financial activities," and that "[o]verseas institutions with only overseas licenses conducting business in mainland China is illegal financial activity." (*Id.* ¶ 34.) Sun did not mention Futu by name in his speech but did specifically reference Futu's recent share price drops. (*Id.*) On October 28, 2021, various news media outlets reported on Sun's speech and indicated Futu was one of the companies operating illegally in China and who were implicated in Sun's speech. (*Id.* ¶¶ 5, 34.) On that same day, a Jeffries analyst noted, "'Futu's share price has dropped by more than 20% premarket,' and identified Sun's statements as the cause for the drop" but also echoed Defendants' statements regarding "'uncertainties' in the law, saying 'we still need to wait for more guidelines from the regulators to address these concerns' about Futu's business model." (*Id.* ¶ 79.)

Third, on December 17, 2021, *Reuters* published an article reporting that Futu would be banned from operating in China in "the coming months." (*Id.* ¶ 35.) The article stated "Futu [is] registered with the Securities and Futures Commission in Hong Kong but that permit does not extend to the mainland. No mainland licence [*sic*] exists for online brokerages specializing in cross-border trades, the sources said." (*Id.* ¶ 35 (alterations in original).) The article also stated Futu "had been communicating with Chinese authorities but had not received any formal orders along the lines of those suggested by *Reuters* reporting" and that Futu "was operating normally."[7] (*Id.*)

Fourth, approximately one year later, on December 30, 2022, both *Reuters* and *The Wall*

---

[6] The Court was not provided with a copy of this speech. To the extent Plaintiff quotes from it, the Court accepts it as accurate unless otherwise stated.

[7] The Amended Complaint does not explicitly allege a specific share price drop of Futu ADS following the publication of this article on December 17, 2021.

*Street Journal* reported that the CSRC had found Futu's securities operations in China to be unlawful, stating Futu's business in China "doesn't comply with the country's laws and regulations," and had banned Futu from opening any new investor accounts in China. (*Id.* ¶ 36.) Upon this news, the price of Futu's ADS closed down 31% on December 30, 2022, "with a trading volume of over eight times the median volume" and "continued to fall on the next trading day, January 3, 2023, falling $2.81, or 6.9%, on a trading volume over three times the median volume." (*Id.* ¶ 81.)

"Through [these] four increasingly targeted revelations, investors eventually came to learn that Futu was, in fact, violating Chinese law, and would ultimately suffer the severest of consequences—the complete removal of Futu's app in . . . China, and a complete ban from acquiring any new users in that market." (*Id.* ¶ 9.) With each of these four revelations, Futu's ADS price "fell dramatically, inflicting substantial harm on Plaintiffs and other investors in Futu ADS." (*Id.*) On May 16, 2023, news media outlets reported "the Chinese government would be removing Futu's app from stores in China because Futu had been illegally operating a securities brokerage business in China without a license." (*Id.* ¶ 43.) On this news, Futu's ADS declined 4.4%. (*Id.* ¶ 85.)

**B. Defendants' Alleged Misrepresentations and Omissions**

Plaintiffs allege Defendants made a series of false and misleading statements and omitted material facts necessary to make the statements made not false or misleading, which can effectively be grouped into three categories: (1) statements regarding Futu's purported compliance with the PRC Securities Law (the "Purported Compliance Statements"); (2) statements regarding Futu's self-proclaimed focus on regulatory compliance (the "Regulatory Focus Statements"); and (3) statements downplaying the impact of the PRC Securities Law on Futu's business in China (the

"Downplayed Legal Impact Statements") (collectively, the "Challenged Statements"). (*See generally* ECF No. 36.)

### i. The Purported Compliance Statements

Plaintiffs allege "Defendants falsely and misleadingly told investors that Futu was in compliance with the applicable regulations in the PRC Securities Law . . . while simultaneously asserting, also falsely or misleadingly, that those regulations were uncertain and that they did not believe Futu even engaged in securities brokerage business in China." (*Id.* ¶ 45.) Defendants stated Futu was in compliance with the applicable regulations, even though the PRC Securities Law contained "uncertainties" related to securities brokerage businesses, and also represented in Futu's public filings that certain law firms Futu had retained determined "Futu was 'in compliance with the applicable PRC laws and regulations related to securities brokerage business in China.'" (*Id.* ¶ 7.)

Futu's public SEC filings during the Class Period disclosed the risk regarding "uncertainties" regarding the PRC Securities Law and related regulations but stated Futu was in compliance with those laws and further stated Futu's counsel had determined Futu was in compliance with the relevant Chinese laws and regulations. (*Id.* ¶ 38.) For example, on April 27, 2020, Futu filed with the SEC its Annual Report on SEC Form 20-F for fiscal year ending December 31, 2019 (the "2019 Annual Report"), which stated in relevant part:

> ***We do not hold any license or permit for providing securities brokerage business in China. Although we do not believe we engage in securities brokerage business in China, there remain uncertainties to the interpretation and implementation of relevant PRC laws and regulations***.
> Pursuant to the relevant PRC laws and regulations, no entity or individual shall engage in securities business without the approval of the securities regulatory authority of the State Council. . . . We do not hold any license or permit in relation to providing securities brokerage business in China. . . . ***However, we do not believe the***

***business we are conducting now through our subsidiaries or consolidated affiliated entities in China is securities brokerage business in China***. In the past, we received inquiries relating to our business from certain regulatory authorities in China. ***We have since then taken measures to modify and enhance our business and platform to be in compliance with the applicable PRC laws and regulations related to securities brokerage business in China***. However, we cannot assure you that the measures we have taken or will take in the future will be effective or fully satisfy the relevant regulatory authorities' requirements. ***Based on the opinion of our PRC counsel, CM Law Firm, we are in compliance with the applicable PRC laws and regulations related to securities brokerage business in China after such modifications in all material aspects. However, there remain some uncertainties as to how the current and any future PRC laws and regulations will be interpreted or implemented in the context of operating securities related business in China***.

We cannot assure you that our current operation model, such as redirecting users and clients to open accounts and make transactions outside China, will not be deemed as operating securities brokerage business in China, which may subject us to further inquiries or rectifications. If certain of our activities in China were deemed by relevant regulators as provision of securities brokerage services, investment consulting services and stock options brokerage business in China, we will be required to obtain relevant licenses or permits from relevant regulatory bodies, including the CSRC, and failure of obtaining such licenses or permits may subject us to regulatory actions and penalties, including fines, suspension of parts or all of our operations in the PRC, and temporary suspension or removal of our websites and mobile application in China. In such cases, our business, financial condition, results of operations and prospects may be materially and adversely affected.

***PRC laws and regulations are evolving, and there are uncertainties relating to the regulation of different aspects of the services we provide through our platforms in China.*** We cannot assure you that we will not be found in violation of any future laws and regulations or any of the laws and regulations currently in effect due to changes in or discrepancies with respect to the relevant authorities' interpretation of these laws and regulations. In addition, ***we may be required to obtain additional license or approvals***, and we cannot assure you that we will be able to timely obtain or maintain all the required licenses or approvals or make all the necessary filings in the future.

(*Id.* ¶ 46; *see also* ECF No. 37-3.) Chen and Li each signed Futu's 2019 Annual Report and

affirmed "based on my knowledge, this report does not contain an untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading[.]" (ECF No. 36 ¶ 47.) Futu's 2020 Annual Report (for fiscal year ending December 31, 2020) and 2021 Annual Report (for fiscal year ending December 31, 2021) contained nearly identical language, and Chen and Li provided substantially similar certifications and statements in those reports. (*Id.* ¶ 48; *see also* ECF Nos. 37-14, 37-15.)

Then, Futu's 2022 Annual Report (for fiscal year ending December 31, 2022) stated in relevant part:

> As announced by the CSRC on December 30, 2022, the CSRC has initiated inquiries on us regarding our cross-border operations in Mainland China, including the provision of cross-border securities services for domestic investors. ***As of the date of this annual report, we have limited information to accurately predict if any disciplinary action or punishment will be taken against us and/or our responsible officers after the conclusion of such inquiries, and if so, the nature and extent of any such action. Although we have been and continue to take rectification measures on our business to be in compliance with laws and regulations and to meet the requirements from the CSRC during the inquiries***, we cannot assure or predict whether the CSRC is satisfied with our rectification measures and whether the CSRC would impose further regulatory actions and penalties on us, including fines, suspension of parts or all of our operations or activities in Mainland China, or suspension or removal of our websites, desktop devices and mobile applications in China[.] . . .
>
> We do not hold any license or permit for providing securities brokerage services in Mainland China. . . . ***We have taken and may continue to take rectification measures based on our communication with or the requirements from the CSRC***. If the CSRC is not satisfied with our rectification measures or the CSRC imposes other further regulatory actions or penalties on us, our business and results of operations may be materially and adversely affected. . . .
>
> ***PRC laws and regulations are evolving, and there are uncertainties relating to the regulation of different aspects of the services we provide through our platforms in China***. We cannot

> assure you that we will not be found in violation of any future laws
> and regulations or any of the laws and regulations currently in effect
> due to changes in or discrepancies with respect to the relevant
> authorities' interpretation of these laws and regulations. In addition,
> we may be required to obtain additional license or approvals, and
> we cannot assure you that we will be able to timely obtain or
> maintain all the required licenses or approvals or make all the
> necessary filings in the future.

(ECF No. 36 ¶ 50; *see also* ECF No. 37-4.) Chen and Li likewise signed this report and affirmed it did not contain untrue statements of material facts or omit any material facts necessary to make the statements contained therein not misleading. (ECF No. 36 ¶ 51.)

Defendants also reassured investors that Futu was in compliance with the PRC Securities Law on Futu's earnings calls. (*Id.* ¶ 39.) For example, on the November 24, 2021 earnings call, one analyst asked Chen about the impact on Futu of China's regulations regarding online brokers' offshore trading, and Chen responded, "In terms of the China regulations, I think we are not in the best position to prejudge what the regulator will do. I think so far, the impact to our client acquisitions in the Great China areas is manageable," and "I think the worst is already behind us. . . . But we think the overall speaking, the situation is still within our control." (*Id.* ¶ 39; ECF No. 37-9 at 7.) Similarly, in response to an analyst's question during an earnings call on March 28, 2023, Chen stated Futu had "full cooperation with the regulators." (ECF No. 36 ¶¶ 40, 56.)

### ii. The Regulatory Focus Statements

Plaintiffs allege Defendants falsely and misleadingly told investors "that Futu 'monitor[ed]' and 'embrac[ed]' the relevant regulations in the PRC Securities Law, was 'actively and transparently' communicating with Chinese regulators about those regulations, and would 'timely disclos[e]' to investors any developments regarding the regulations that 'may have a material adverse impact on the Company's business operation.'" (*Id.* ¶ 53 (alterations in original).) For example, in an earnings call on November 24, 2021, Defendants stated Futu was focused on

complying with the relevant provisions of the PRC Securities Law, and, in particular, "when an analyst expressed that there were 'some concerns about legality of offshore trading by online brokers,' and asked whether 'management can shed some light on the impact of the government regulation,'" Li (through translation) responded in relevant part:

> Yes. ***We are business as usual here at Futu***, and our business model is nothing new. . . . ***And we have always been embracing the regulations and have a very high set of standards for operational compliance, and we are actively and transparently communicating with the regulators, and we anticipate and welcome more guidance from the regulators*** to both us and the industry as a whole. And if there are new regulatory guidance is coming out, I think we'll abide by these regulations as soon as possible. ***And as a listed company, we'll timely update any new information available to us***.

(*Id.* ¶ 54.) A few weeks later, on December 17, 2021, Futu issued a press release titled "Futu Responds to Media Report," which stated in relevant part:

> [Futu], a leading tech-driven online brokerage and wealth management platform, today responds to the media speculations regarding potential PRC regulatory policies that may have a material adverse impact on the Company's business operation. As a Nasdaq-listed company, ***Futu is committed to timely disclosing recent developments that may have a material adverse impact on the Company's business operation, including regulatory developments***.
> ***Futu always maintains active communication with different competent PRC regulatory authorities in its ordinary course of business. To date, the Company has not received (nor is it aware of) any notice, guidance or order from any PRC regulatory authorities which is expected to have a material adverse impact on its business operation or financial conditions***. In terms of serving the PRC clients, Futu has been abiding by the same rules and regulations and adopting the similar industry practices and business models as other brokers who hold the same type of licenses in Hong Kong. No further innovations or breakthroughs have been made by Futu with respect to the business model. There is no such "internet broker-dealer" category or definition under relevant legal framework and nowadays almost all broker-dealers are using internet (through App and/or website) to serve their clients. ***Futu will keep monitoring regulatory developments and continue to***

> *fully cooperate with relevant regulatory authorities*.
> During the recent period, ***the Company noticed that some individuals and institutions have been spreading false or fake information about Futu on social media with the purpose of profiting from short-selling***. We have gathered relevant information and further reported to relevant regulators. We also reserve our right to take legal action. . . .

(*Id.* ¶ 55.)

More than a year later, during an earnings call on March 28, 2023, Chen responded to an analyst's question regarding the impact on Futu of the CSRC's December 2022 announcement regarding tightening offshore brokers and stated in relevant part:

> ***[R]egarding the CSRC's news at the end of last year, I think we – number one, we fully accept the regulator's point of view, and we have a full cooperation with the regulators. On a net-to-net basis, we do think it will be healthy for the industry's long-term growth***. And also, if you follow you, there are some clarities from the CSRC spokesperson in the middle of February, mentioning how to deal with the existing clients. They ask for orderly deal with the existing clients. It will be an industry-wide situation. So we will take a very constructive manners to cooperate with the regulators in this regard.

(*Id.* ¶ 56.)

### iii.  The Downplayed Legal Impact Statements

Plaintiffs also allege "Defendants misleadingly downplayed the adverse impact that the applicable PRC Securities Law had on Futu's ability to do business in China . . . falsely assuring investors that Futu's growth prospects in that market remained 'very strong.'" (*Id.* ¶ 58.) For example, during an earnings call on November 19, 2020, an analyst asked "[s]o what will be our strategy in the future to acquire the mainland China users, which seems to be – have a larger user base that we could explore into?" (*Id.* ¶ 59.) Chen responded: "And with regards to our mainland [China] client acquisition, I think we use different client acquisition strategies because of the number of constraints. . . . So we have different client acquisition strategies for mainland, and we

think the growth prospects in mainland [China] are very strong." (*Id.*) Similarly, during an earnings

call on November 24, 2021, in response to an analyst's question regarding "concerns about legality

of offshore trading by online brokers" and whether "management can shed some light on the

impact of the government regulation[,]" Chen responded in relevant part:

> In terms of the China regulations, I think we are not in the best position to prejudge what the regulator will do. I think so far, the impact to our client acquisitions in the Great China areas is manageable. I can share a little bit more color, which I think may be helpful for analysts and also the investors to gauge how the negative impact on the recent headline use because of that, what's the implication to our client acquisitions across board. Definitely, we see certain asset outflows among clients in the Great China areas, amid the concerns over media report.
>
> Overall speaking, we think the impact is still very short term and manageable from mid – from the mid-October to mid-November, the net asset outflows accounts for less than 2% of our total client assets. . . . In my personal thought, I think the worst is already behind us. Of course, the market volatility alongside with seasonality effect in Q4, together with this headline news, definitely enhanced attrition rate for existing paying clients and also create some challenges for new client acquisition across the board in the near term. But we think the overall speaking, the situation is still within our control.

(*Id.* ¶ 60; ECF No. 37-9 at 7.) Likewise, during an earnings call on March 28, 2023, in response to

an analyst's question regarding the impact on Futu's business operations following the "CSRC

announcement on tightening of the offshore brokers" in December 2022, Chen responded in

relevant part:

> Let me answer your question. First of all, I'll give you some general color about our client's movement following the end of last year's news flow. We do witness some our Hong Kong clients because of the – there are some sentiment concerns, there are some client outflows in – particularly in the first half of January. **But I think the overall amount is quite manageable**. Roughly, I think the net outflow at the time accounts for roughly 1% to 2% of our total client assets, which, **compared with the situation we faced and at the end of 2021, we think the situation was manageable**. . . . Secondly, regarding the CSRC's news at the end of last year, I think we --

> number one, we fully accept the regulator's point of view, and we
> have a full cooperation with the regulators. On a net-to-net basis, we
> do think it will be healthy for the industry's long-term growth. And
> also, if you follow you, there are some clarities from the CSRC
> spokesperson in the middle of February, mentioning how to deal
> with the existing clients. They ask for orderly deal with the existing
> clients. It will be an industry-wide situation. So we will take a very
> constructive manners to cooperate with the regulators in this regard.

(ECF No. 36 ¶ 61; ECF No. 37-12 at 10.)

### C. Procedural History

On June 12, 2023, Plaintiffs filed a Class Action Complaint against Defendants for alleged

violations of the federal securities laws. (ECF No. 1.) On January 16, 2024, Plaintiffs filed an

Amended Class Action Complaint ("Amended Complaint") asserting the following two causes of

action: (1) "Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a)-(c) Promulgated

Thereunder Against All Defendants" (Count I), and (2) "Violations of Section 20(a) of the

Exchange Act Against All Defendants" (Count II). (ECF No. 36.) On February 29, 2024,

Defendants filed a Motion to Dismiss the Amended Complaint pursuant to Federal Rules of Civil

Procedure 8(a), 9(b), and 12(b)(6). (ECF No. 37.) On April 15, 2024, Plaintiffs filed an Opposition

(ECF No. 39), and on May 15, 2024, Defendants filed a Reply (ECF No. 42). Also on May 15,

2024, Chen filed a Notice of Joinder to Futu's pending Motion to Dismiss.[8] (ECF No. 41.) On

August 28, 2024, Li filed a Notice of Joinder to Futu and Li's pending Motion to Dismiss.[9] (ECF

---

[8] Chen notes he "had not been properly served in this action" at the time the Motion to Dismiss
was filed. (ECF No. 41 at 2 n.1.) Chen further states that although Plaintiffs filed a proof of service
on April 9, 2024, he "maintains that this service attempt was invalid because it did not comply
with the requirements of the Hague Convention." (*Id.*) However, he "agreed to voluntarily appear"
but asserts he "reserves all rights and defense[s], other than with respect to service of process."
(*Id.*)

[9] Li notes he "had not been properly served in this action" at the time the Motion to Dismiss was
filed. (ECF No. 44 at 2 n.1.) Li further states he "notified counsel that attempted service in this
matter was made[,]" and "[w]ithout conceding whether the service attempt complied with the

No. 44.)

## II.    LEGAL STANDARD

### A.  Rule 12(b)(6)

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the non-moving party]." *Phillips*, 515 F.3d at 228. "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (alteration in original) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555 (citations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). This "plausibility standard" requires the complaint to allege "more than a sheer possibility that a

---

requirements of the Hague Convention, [he] has agreed to voluntarily appear." (*Id.*) However, he "reserves all rights and defenses, other than with respect to service of process." (*Id.*)

defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* (citing *Twombly*, 550 U.S. at 556). "[D]etailed factual allegations" are not required, but "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" must be pleaded; it must include "factual enhancement" and not just conclusory statements or a recitation of the elements of a cause of action. *See id.* (citations omitted). In assessing plausibility, the court may not consider any "[f]actual claims and assertions raised by a defendant[.]" *Doe v. Princeton Univ.*, 30 F.4th 335, 345 (3d Cir. 2022).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)). Indeed, after *Iqbal*, conclusory or "bare-bones" allegations will no longer survive a motion to dismiss: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678 (citing *Twombly*, 550 U.S. at 555). To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible, "allow[ing] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556, 570). The Supreme Court's ruling in *Iqbal* emphasizes that plaintiffs must show that the allegations of their complaints are plausible. *See id.* at 670.

While courts generally may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to

one for summary judgment pursuant to Rule 56]." *See In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "document *integral to or explicitly relied* upon in the complaint." *In re Burlington*, 114 F.3d at 1426 (quoting *Shaw*, 82 F.3d at 1220). However, "[w]hen the truth of facts in an 'integral' document are contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail." *Princeton Univ.*, 30 F.4th at 342.

### B. Heightened Pleading Standard

"[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) (alteration in original) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)). Courts must also "consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* (quoting *Tellabs*, 551 U.S. at 322). However, because this is a securities fraud case, plaintiffs must satisfy the heightened pleading rules codified in the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *Id.* The PSLRA replaced Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") "as the applicable pleading standard in private securities class actions." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 242 n.3 (3d Cir. 2013) (citing *Avaya*, 564 F.3d at 253). "Nonetheless, 'Rule 9(b)'s particularity requirement is comparable to and effectively subsumed by the requirements of [15 U.S.C. § 78u–4(b)(1) of] the PSLRA.'" *Id.* (alteration in original) (quoting *Avaya*, 564 F.3d at 253).

Pursuant to Rule 9(b), when alleging fraud, "a party must state with particularity the circumstances constituting fraud or mistake, although 'intent, knowledge, and other conditions of

a person's mind may be alleged generally.'" *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 249 (3d Cir. 2017) (quoting Fed. R. Civ. P. 9(b)); *see also United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (holding that a "plaintiff alleging fraud must . . . support its allegations with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue" (citation omitted)). Accordingly, "a party must plead [its] claim with enough particularity to place defendants on notice of the 'precise misconduct with which they are charged.'" *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 502 (3d Cir. 2017) (citation omitted).

Likewise, "[u]nder the PSLRA's heightened pleading instructions, any private securities complaint alleging that the defendant made a false or misleading statement must: (1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading'"; and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs*, 551 U.S. at 321 (alteration in original) (quoting 15 U.S.C. §§ 78u-4(b)(1), (b)(2)). Therefore, the PSLRA "requires that a complaint 'state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention "to deceive, manipulate, or defraud."'" *Rahman*, 736 F.3d at 241–42 (quoting *Tellabs*, 551 U.S. at 313).

"To plead falsity, Rule 9(b) and the PSLRA each demand specificity." *Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 680 (3d Cir. 2023). "Rule 9(b) requires that a fraud plaintiff "state with particularity the circumstances constituting fraud[,]" *i.e.*, "the time, place, and contents of the false representations or omissions, as well as the identity of the person making the statement and the basis for the statement's falsity." *Id.* "Like Rule 9(b), the PSLRA

requires the pleadings to identify 'each statement alleged to have been misleading' and to specify 'the reason or reasons why the statement is misleading.'" *Id.* (quoting 15 U.S.C. § 78u-4(b)(1)). "And if allegations of falsity are based on information and belief, instead of on 'evidentiary support,' the PSLRA requires the complaint to plead, with particularity, facts 'sufficient to support a reasonable belief as to the misleading nature of the statement or omission' before the allegations can be accepted as true." *Id.* (citations omitted). To satisfy this particularity requirement, the plaintiff must plead "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. "Upon a motion by any defendant, a claim for securities fraud under § 10(b) and Rule 10b-5 that lacks particularized allegations of falsity must be dismissed." *Warren Police*, 70 F.4th at 681.

"Although the pleading standards in Rule 9(b) and the PSLRA can be generally reconciled harmoniously for allegations of falsity, the PSLRA's requirements for allegations of *scienter* control over the more lenient standard in Rule 9(b) for mental-state allegations." *Id.* at 681 n.1 (citing *Avaya*, 564 F.3d at 253 ("The PSLRA's requirement for pleading scienter . . . marks a sharp break with Rule 9(b).")); *Tellabs*, 551 U.S. at 323–24); *compare* Fed. R. Civ. P. 9(b) (permitting "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally"), *with* 15 U.S.C. § 78u-4(b)(2)(A) (requiring a particularized statement of the "facts giving rise to a strong inference that the defendant acted with the required state of mind").

### C. PSLRA Safe Harbor

The PSLRA's safe harbor provision "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful

cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with

actual knowledge of its falsehood." *Avaya*, 564 F.3d at 254 (citing 15 U.S.C. § 78u-5(c)).

> The term "forward-looking statement" is broadly defined in the statute to include statements "containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items"; statements of "the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer"; or statements of "future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission." 15 U.S.C. § 78u-5 (i)(1)(A)-(C). Further, forward-looking statements include "any statement of the assumptions underlying or relating to any statement described" in the definition. § 78u-5(i)(1)(D).

*Id.* at 255. Mixed present and future statements are entitled to the safe harbor only as to the portion

of the statement that refers to the future. *Id.* (citations omitted). Additionally, to be protected under

the PSLRA safe harbor, the forward-looking statements must be accompanied by "extensive and

specific" cautionary language. *Id.* at 256 (quoting *GSC Partners CDO Fund v. Washington*, 368

F.3d 228, 243 n.3 (3d Cir. 2004)). "[A] vague or blanket (boilerplate) disclaimer which merely

warns the reader that the investment has risks will ordinarily be inadequate to prevent

misinformation. To suffice, the cautionary statements must be substantive and tailored to the

specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge."

*Id.* (quoting *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000)).

## III. DECISION

The Court first addresses whether Plaintiffs have sufficiently alleged Section 10(b) and

Rule 10b-5 violations against the Defendants and then addresses whether Plaintiffs have

sufficiently alleged a Section 20(a) violation against the Individual Defendants.

### A. Defendants' Motion to Dismiss Plaintiffs' Section 10(b) and 10b-5 Claims (Count I of the Amended Complaint)

Defendants argue Plaintiffs' Amended Complaint should be dismissed for failure to state a claim under Section 10(b) of the Exchange Act. (*See generally* ECF Nos. 37-1, 42.) Specifically, Defendants contend: (1) Plaintiffs fail to plead any material misrepresentation or omission; (2) Plaintiffs fail to plead any facts supporting the requisite inference of scienter; (3) Plaintiffs fail to plead loss causation; and (4) Plaintiffs fail to plead scheme liability. (ECF No. 37-1 at 17–40; ECF No. 42 at 4–15.) Defendants also submit that because Plaintiffs have not sufficiently pled a Section 10(b) claim, their Section 20(a) claim against the Individual Defendants also fails. (*Id.* at 15 n.13.)

In opposition, Plaintiffs argue Defendants' Motion should be denied because: (1) they adequately alleged actionable misstatements and omissions—namely, that Defendants made false and misleading statements about (a) Futu's purported compliance with the PRC Securities Law, (b) Futu's purported focus on regulatory compliance, and (c) downplaying the impact of the PRC Securities Law on Futu's business; (2) they allege a strong inference of scienter; (3) they adequately allege loss causation; (4) they plead a scheme claim; and (5) they plead a Section 20(a) claim. (ECF No. 39.)

### i. Alleged Material Misrepresentations or Omissions

Defendants argue Plaintiffs have failed to plead any material misrepresentation or omission because Plaintiffs "fail to plead any illegal conduct with particularity"; Futu disclosed the relevant risks and information; "Futu had no duty to disclose uncharged, unadjudicated wrongdoing;" and certain challenged statements are not false or misleading and/or are nonactionable opinions. (ECF No. 37-1 at 18–31.) Defendants also contend the disclosures in their annual reports "cited to the relevant parts of the [PRC] Securities Law, explained their implications, and reiterated that securities businesses operating in China are 'subject to the approval of the securities regulatory

authority of the State Council.'" (*Id.* at 19.) Defendants also assert that each of Futu's annual reports during the Class Period explicitly disclosed in bold italicized text: "***We [referring to Futu] do not hold any license or permit for providing securities brokerage business in China.***" (*Id.*; *see also* ECF No. 33-3 (Futu's 2019 Annual Report); ECF No. 33-4 (Futu's 2022 Annual Report); ECF No. 33-14 (Futu's 2020 Annual Report); ECF No. 33-15 (Futu's 2021 Annual Report).) Defendants state the disclosed risk of the possibility that Futu's business model could be deemed as unlawfully operating a brokerage business in China given the then-uncertainties surrounding the PRC Securities Law and regulations and how they would be applied to Futu "is precisely what slowly materialized." (ECF No. 37-1 at 3.) Additionally, Defendants submit that "Futu's disclosures did not become false or misleading in hindsight just because PRC authorities' view of Futu's business model later changed" and, in any event, "Futu expressly warned of that risk and provided investors with all material facts to assess the risk themselves." (*Id.* at 4.) Defendants also argue Futu "had no duty to preemptively accuse itself of violating PRC law" and Plaintiffs do not allege, let alone with the requisite particularity, any other facts showing Futu had a duty to disclose or which rendered its disclosures misleading. (*Id.*) Further, Defendants state to the extent Plaintiffs are challenging Futu's opinion regarding its legal compliance or forward-looking growth expectations, those statements are legally inactionable. (*Id.* at 4, 29–31.) Therefore, Defendants submit the Amended Complaint "should be dismissed because none of the four purported corrective disclosures revealed any prior misrepresentation or the materialization of a concealed risk." (*Id.* at 39.)

In opposition, Plaintiffs argue they have sufficiently alleged material misrepresentations or omissions because "[t]hroughout the Class Period, Defendants falsely reassured investors that Futu complied with the PRC Securities Law, and that the applicable regulations were 'uncertain'" when

in fact the PRC Securities Law required foreign securities companies to obtain brokerage licenses, which requisite license Futu did not have and never obtained. (ECF No. 39 at 10–12.) Specifically, Plaintiffs contend Defendants falsely claimed in Futu's 2019, 2020, and 2021 Annual Reports that "Futu did not 'engage[] in securities brokerage business in China,' and therefore did not need a Chinese brokerage license" and also "that Futu was 'in compliance with the applicable PRC laws and regulations related to securities brokerage business in China.'" (*Id.* (citing ECF No. 36 ¶¶ 46–48).) Plaintiffs assert that despite public declarations (including the October 14, 2021 *People's Daily* article, Sun's October 28, 2021 speech, and the December 17, 2021 *Reuters* article) indicating Futu's operations in China were illegal, Defendants continued to maintain Futu was compliant with the applicable Chinese securities laws. (*Id.* at 12.) Plaintiffs also state Defendants' statement in its 2022 Annual Report that Futu was taking "rectification measures" to comply with the Chinese securities laws was false "because the only possible 'rectification measure' was to apply for the required Chinese brokerage license, which Defendants still did not do." (*Id.* at 12.) Additionally, Plaintiffs argue Defendants never disclosed the PRC Securities Law explicitly required a license to operate in China but rather falsely stated in its disclosures that the license was not required. (*Id.* at 15.)

In reply, Defendants argue, among other things: (1) Plaintiffs' opposition hinges on their mischaracterization of Article 2 of the 2020 amendment to the PRC Securities Law, which Plaintiffs assert made clear that Futu was "explicitly required" to obtain a license, but Defendants state this amendment as "Article 2 has nothing to do with the licensing requirement[,]" nor does it state the PRC Securities Law applies to online brokerage companies like Futu; (2) Plaintiffs have not identified any "unequivocal official pronouncement prohibiting" Futu's alleged misconduct, and at no point did regulators claim Futu violated the 2020 amendment to the PRC Securities Law;

(3) Plaintiffs' reliance on unnamed sources in *Wall Street Journal* and *Reuters* articles can only be used to satisfy the PSLRA's pleading requirements where "the complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame," which the articles here do not satisfy; (4) "Futu had no duty to disclose uncharged, unadjudicated wrongdoing" and (5) Defendants' statements about Futu's growth prospects in China and the impact of market rumors regarding increased regulation "are nonactionable opinions and puffery" and "[c]ritically, Plaintiffs have still not pointed to a single report or other information to support the suggestion that Futu 'subjectively disbelieved' its opinion or otherwise 'lacked a reasonable basis for their expressed belief' in 2020 that growth prospects in [] China were 'very strong.'" (ECF No. 42 at 6–12 (citations omitted).)

"The private right of action under Section 10(b) and Rule 10b–5 . . . creates liability for false or misleading statements or omissions of material fact that affect trading on the secondary market." *In re Burlington*, 114 F.3d at 1417. To state a claim for securities fraud pursuant to Section 10(b) of the Exchange Act, "plaintiffs must allege (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014) (citations omitted). "To prevail on a § 10(b) claim, a plaintiff must show that the defendant made a misleading statement or omission as to a material fact." *Howard v. Arconic Inc.*, 395 F. Supp. 3d 516, 537 (W.D. Pa. 2019) (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011)). "[A] fact or omission is material only if 'there is a substantial likelihood that it would have been viewed by the reasonable investor as having significantly altered the "total mix" of information'

26

available to the investor." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) (quoting *Levinson*, 485 U.S. at 231–32). "[W]hen a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock." *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000). "Because in an efficient market 'the concept of materiality translates into information that alters the price of the firm's stock,' if a company's disclosure of information has no effect on stock prices, 'it follows that the information disclosed . . . was immaterial as a matter of law.'" *Id.* (quoting *Burlington*, 114 F.3d at 1425). However, "vague and general statements of optimism 'constitute no more than "puffery" and are understood by reasonable investors as such.'" *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999) (quoting *Burlington Coat Factory*, 114 F.3d at 1428 n.14)). "A statement is considered puffery only when it is immaterial." *Enzymotec*, 2015 WL 8784065, at *14. An opinion "is misleading if it: (i) was not sincerely believed when made; (ii) contains an expressly embedded, untrue factual assertion; or (iii) reasonably implies untrue facts and omits appropriate qualifying language." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 686 (3d Cir. 2023).

Likewise, to state a claim for securities fraud under Rule 10b–5, a plaintiff "must 'allege defendants made a misstatement or an omission of material fact with scienter in connection with the purchase or the sale of a security upon which plaintiffs reasonably relied and plaintiff's [sic] reliance was the proximate cause of their injury.'" *Avaya*, 564 F.3d at 251 (quoting *Winer Family Tr. v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007)). However, "Section 10(b) and Rule 10b–5 'do not create an affirmative duty to disclose any and all material information.'" *Edinburgh Council*, 754 F.3d at 174 (quoting *Matrixx Initiatives*, 563 U.S. at 44). "Disclosure is required . . . only when necessary 'to make . . . statements made, in the light of the circumstances under which they were

made, not misleading.'" *Id.* (alterations in original) (quoting *Matrixx Initiatives*, 563 U.S. at 44). "Silence, absent a duty to disclose, is not misleading under Rule 10b–5." *Id.* (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)).

To satisfy the heightened pleading standard in a securities-fraud case, "media sources must be sufficiently detailed to indicate [] their reliability and be based on an independent investigative effort." *In re Mylan N.V. Sec. Litig.*, Civ. A. No. 20-00955, 2023 WL 3539371, at *6 (W.D. Pa. May 18, 2023) (alteration in original) (quoting *In re Loewen Grp. Inc. Sec. Litig.*, Civ. A. No. 98-06740, 2004 WL 1853137, at *6 (E.D. Pa. Aug. 18, 2004)); *see In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008) ("[N]ewspaper articles should be credited only to the extent that other factual allegations would be—if they are sufficiently particular and detailed to indicate their reliability. Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel." (citation and internal quotation marks omitted)). Generally, when considering confidential witness allegations, it is proper to "evaluat[e] the 'detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia.'" *Avaya*, 564 F.3d at 263 (quoting *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004)).

### 1. The Alleged False and Misleading Purported Compliance Statements

Here, with respect to the Purported Compliance Statements, the Court finds Plaintiffs have not adequately alleged that the Purported Compliance Statements were material misstatements or omissions because Plaintiffs have not alleged with sufficient particularity how Defendants' statements—regarding their then-current beliefs that they were in compliance with the PRC Securities Law and related regulations and that they did not need a brokerage license in China—

were false or otherwise misleading at the time they were made. Plaintiffs do not allege any internal and/or contradictory information undercutting Futu's belief that it was compliant with the PRC Securities law or did not need a license at the time the Purported Compliance Statements were made, which belief was supported by advice of Futu's legal counsel. Plaintiffs also have not adequately alleged facts showing this opinion "(i) was not sincerely believed when made; (ii) contains an expressly embedded, untrue factual assertion; or (iii) reasonably implies untrue facts and omits appropriate qualifying language." *City of Warren Police*, 70 F.4th at 686.

Plaintiffs argue Defendants "never disclosed that [the] PRC Securities Law explicitly required the license to operate in China" (ECF No. 39 at 15), but do not point to anything showing Defendant had the duty to disclose this. Additionally, as Defendants note, Article 2 of the 2020 amendment to the PRC Securities Law does not explicitly state a license is required; indeed, it does not relate to licensing more generally but rather states in relevant part, "Where the issuance and transactions of securities outside the territory of [China] ***have disrupted the market order*** . . . ***and damaged the legitimate rights and interests of investors within the territory***, such activities shall be handled and investigated for legal responsibility in accordance with the relevant provisions of this Law." (ECF No. 37-3 at 4.) Plaintiffs have not alleged any facts supporting that Futu disrupted the market order or damaged the rights and interests of investors in China, nor do they allege that the CSRC (or anyone else) ever even stated Futu violated this amendment. Indeed, the Amended Complaint itself notes Futu stated in its December 17, 2021 press release that "***[t]o date, [Futu] has not received (nor is it aware of) any notice, guidance or order from any PRC regulatory authorities which is expected to have a material adverse impact on its business operation or financial conditions.***" (ECF No. 36 ¶ 55.) Plaintiffs also do not allege non-conclusory facts showing the PRC Securities Law "explicitly required" Futu to obtain a license.

In other words, Plaintiffs have not sufficiently alleged facts showing Futu gave investors unqualified false assurances that it was in compliance with the PRC Securities Law or that a license was not required for Futu (as compared to any other similar businesses). Rather, the allegations support that Defendants (1) disclosed the pertinent regulations, *i.e.*, the PRC Securities Law and related Chinese regulations; (2) explicitly disclosed the fact that Futu did *not* hold a brokerage license for providing securities brokerage business in China; (3) disclosed Futu's belief that it did not need such a license, which belief was supported by legal advice from its counsel stating it did not need such a license; (4) despite this belief, disclosed the uncertainties surrounding the PRC Securities Law and related regulations; and (5) disclosed the risks that the Chinese regulatory authorities could find Futu non-compliant with the Chinese securities laws and the potential consequences if that were to happen. Indeed, as the Amended Complaint alleges, Defendants explicitly disclosed in its 2019, 2020, and 2021 Annual Reports: ***"We do not hold any license or permit for providing securities brokerage business in China"*** and ***"Although we do not believe we engage in securities brokerage business in China, there remain uncertainties to the interpretation and implementation of relevant PRC laws and regulations.***" (*See* ECF No. 37-3 at 13; ECF No. 37-14 at 17; ECF No. 37-15 at 22.) Defendants likewise disclosed in its 2022 Annual Report: ***"We do not hold any license or permit for providing securities brokerage business in China"*** and "We have taken and may continue to take rectification measures based on our communication with or the requirements from the CSRC[,]" but "***[i]f the CSRC is not satisfied with our rectification measures or the CSRC imposes other further regulatory actions or penalties on us, our business and results of operations may be materially and adversely affected***." (ECF No. 37-4 at 29.) Defendants also repeatedly cautioned: "***We cannot assure you that our current operational model . . . will not be deemed as operating securities brokerage***

*business in China*" and disclosed the potential consequences "including fines, suspension of parts or all of our operations in the PRC, and temporary suspension or removal of our websites and mobile application in China" if the relevant regulators deemed Futu's activities as the "provision of securities brokerage services, investment consulting services and stock options brokerage business in China[.]" (ECF No. 37-3 at 13; ECF No. 37-14 at 17; ECF No. 37-15 at 22.) Additionally, while Plaintiff alleges Futu's statement in its 2022 Annual Report that it was taking "rectification measures" to comply with the Chinese securities laws was false, this allegation relies on an assumption that the only rectification measure for Futu was to apply for and obtain the required Chinese brokerage license, which may not necessarily have been the case, depending on additional facts not pled in the FAC.

### 2. The Alleged False and Misleading Regulatory Focus Statements

With respect to the Regulatory Focus Statements, the Court likewise finds Plaintiffs have not adequately alleged that these were material misstatements or omissions because they have not alleged with sufficient particularity how Defendants' statements about monitoring regulatory developments and cooperating with, and maintaining active communications with, PRC regulatory authorities were false. For example, Plaintiffs have not alleged that Defendants did *not* cooperate or regularly communicate with PRC regulatory authorities or that Defendants did *not* monitor regulatory developments. Plaintiffs have not otherwise alleged with particularity how these statements were false or misleading.

### 3. The Alleged Downplayed Legal Impact Statements

With respect to the Downplayed Legal Impact Statements, the Court similarly finds Plaintiffs have not adequately alleged that these were material misstatements or omissions because they have not alleged with sufficient particularity how Defendants' statements about the potential

legal impact of the PRC Securities Law and related regulations on Futu's business operations in China were false or otherwise misleading at the time they were made. While Plaintiffs highlight certain statements Defendants made including "we think the growth prospects in mainland [China] are very strong," and the situation is "manageable" and "within our control," these selected statements, when read in context and absent other facts not currently present in the FAC, do not appear to be false or misleading at the time they were made. For example, Plaintiffs do not allege that Defendants' growth prospects in China were not strong at the time that statement was made; rather, they appear to be relying on the assumption that this statement must not have been true because Futu was allegedly operating illegally as a securities brokerage in China without the required license. However, this is not sufficient to meet the particularity standard for securities fraud as it relates to these statements.

Accordingly, the Court finds the Amended Complaint fails to satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA because, even accepting the Amended Complaint's factual allegations as true, it does not sufficiently allege with the requisite particularity a material misrepresentation or omission by Defendants. The Amended Complaint does not allege sufficient facts showing how Defendants' Purported Compliance Statements, Regulatory Focus Statements, and Downplayed Legal Impact Statements were false at the time they were made, as opposed to in hindsight or otherwise. "To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events." *Keystone Assocs. LLC v. Barclays Bank PLC*, Civ. A. No. 19-00796, 2020 WL 109008, at *3 (D. Del. Jan. 9, 2020) (quoting *In re NAHC, Inc. Sec. Litig*, 306 F.3d 1314, 1330 (3d Cir. 2002)). Further, Plaintiffs' claim is essentially that Defendants misled investors to believe Futu was in compliance with the applicable PRC Securities Law and related regulations in

when in fact it was allegedly illegally operating a securities business in China without a license, and Defendants simultaneously stated they did not believe Futu was engaged in securities brokerage business in China and therefore did not need a license, based on advice from Futu's legal counsel. But despite Futu's beliefs, the Amended Complaint also alleges Futu explicitly disclosed that uncertainties remained regarding how the Chinese securities laws and regulations would be interpreted or applied as to Futu and disclosed the associated risks that Futu could be deemed to be in non-compliance with those laws and the consequences that would result if that occurred. *See In re Amarin Corp. PLC Sec. Litig.*, Civ. A. No. 21-02071, 2022 WL 2128560, at *3 (3d Cir. June 14, 2022) (affirming dismissal of a securities litigation complaint, agreeing with the district court that the complaint failed to adequately allege a materially false or misleading statement where the alleged statements were statements of opinion and did not lack a reasonable basis; and further finding plaintiffs' theory of omission liability unpersuasive given the defendants' contemporaneous disclosures, noting "the defendants 'warned of the exact risk [the] [p]laintiffs argue they failed to disclose'" in their annual SEC filings (alterations in original)); *cf. Rubinstein v. Credit Suisse Grp. AG*, 457 F. Supp. 3d 289, 296 (S.D.N.Y. 2020) ("A Section 11 [of the Securities Act of 1933] claim fails as a matter of law when a registration statement 'warns of the exact risk that later materialized.'" (quoting *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013))).

Additionally, Plaintiffs have not adequately alleged that Defendants had any duty to disclose uncharged, unadjudicated wrongdoing or any duty to generally disclose the PRC Securities Law's license requirement. *See Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 580 (S.D.N.Y. 2016) ("Corporations do not, as a general matter, have a duty 'to disclose uncharged, unadjudicated wrongdoing.'" (quoting *Pontiac Policemen's & Firemen's Ret. Sys. v.*

*UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014))).

Therefore, Defendants' Motion to Dismiss Count I of the Amended Complaint is **GRANTED**. Because the Court finds the Amended Complaint does not sufficiently allege with particularity a material misrepresentation or omission made by Defendants, it concludes that further analysis of the Amended Complaint is unnecessary at this time. *See Osio v. DeMane*, Civ. A. No. 05-02283, 2006 WL 2129460, at *12 (D.N.J. June 20, 2006) (noting "the Court need not address the remaining elements of a claim under § 10(b) or Rule 10b-5" because plaintiffs did not sufficiently plead an omission of material fact).

### B. Defendants' Motion to Dismiss Plaintiffs' Section 20(a) Claim Against the Individual Defendants (Count II of the FAC)

Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Liability under Section 20(a) "is derivative of an underlying violation of Section 10(b) by the controlled person." *Rahman*, 736 F.3d at 247 (quoting *Avaya*, 564 F.3d at 252). "Thus, for a controlling person to be liable, the person over whom control was exercised must have committed a primary violation of the securities laws." *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 280 (D.N.J. 2007) (citations omitted).

Here, because the Court found the Amended Complaint fails to state a claim under Section 10(b), and liability under Section 20(a) is derivative of an underlying Section 10(b) violation, the Court finds the Amended Complaint also fails to state a claim under Section 20(a) against the Individual Defendants. *See Biondolillo v. Roche Holding AG*, Civ. A. No. 17-04056, 2019 WL

34

1468140, at *4 (D.N.J. Apr. 3, 2019) ("Because the Second Amended Complaint fails to state a claim under Section 10(b), it also fails to state a claim under Sections 20(a) and 20A.").

Therefore, Defendants' Motion to Dismiss Count II of the Amended Complaint is **GRANTED**.

### C. Leave to Amend

Defendants request Plaintiffs' Amended Complaint be dismissed with prejudice. (ECF No. 37-1 at 5, 40.) However, the Federal Rules of Civil Procedure generally require the Court to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15. "In the Third Circuit, plaintiffs whose complaints fail to state a cause of action are entitled to amend their complaint unless doing so would be inequitable or futile." *Lovallo*, 2015 WL 7300492, at *14 (citing *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007)).

Here, allowing Plaintiffs to amend would not be futile as they could provide additional factual content to attempt to cure the deficiencies in the FAC. *See Munenzon v. Peter Advisors, LLC*, 553 F. Supp. 3d 187, 210 (D.N.J. 2021); *see also United States ex rel. Petratos v. Genentech, Inc.*, Civ. A. No. 11-03691, 2014 WL 7331945, at *2 (D.N.J. Dec. 18, 2014) (stating that "within the Third Circuit, even when a complaint is vulnerable to Rule 12(b)(6) dismissal, the district court should allow the party a curative amendment, unless the amendment would be futile or inequitable").

Therefore, the Court denies Defendants' request to dismiss the Amended Complaint with prejudice and grants Plaintiffs leave to file a second amended complaint.

### IV. CONCLUSION

For the reasons set forth above, Defendants' Motions to Dismiss (ECF Nos. 37, 41, and 44) are **GRANTED**, and Plaintiffs' Amended Complaint is **DISMISSED WITHOUT**

**PREJUDICE**. An appropriate Order follows.


Dated:  September 25, 2024                    */s/ Brian R. Martinotti*
                                              **HON. BRIAN R. MARTINOTTI**
                                              **UNITED STATES DISTRICT JUDGE**